**ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 03–2209C

United States Court of Federal Claims.

November 22, 2013

Donald S. Samuelson, Law Offices of Donald S. Samuelson,[1] Lake Forest, Illinois, for plaintiff.

Douglas K. Mickle, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were Bryant G. Snee, Acting Director, Commercial Litigation Branch, and Stuart F. Delery, Assistant Attorney General. Gregory G. Gustin, Maria T. Baguio, and Lorraine C. Shoto, Office of General Counsel, United States Department of Housing and Urban Development, Chicago, Illinois, of counsel.

## OPINION

HORN, J.

The issue before this court is the result of a limited remand by the United States Court

---

1. Mr. Samuelson, the principal of Englewood Terrace Limited Partnership (Englewood), previously had retained counsel during the pre-trial and trial phases of this case. At some point after the trial, Mr. Samuelson, a licensed attorney, opted to represent Englewood.

of Appeals for the Federal Circuit in the above captioned case on one portion of the damages calculation previously determined by the court. The Federal Circuit affirmed most of the factual findings and legal conclusions of this court's earlier opinion, but remanded to this court, for further review on the single issue of a possible reduction in the $3,272,217.00 award to the plaintiff, Englewood, of lost profits stemming from a breach by the United States Department of Housing and Urban Development (HUD) of the 2000 Housing Assistance Payment (HAP) contract between the plaintiff and the government. The Federal Circuit indicated in its decision that a remand is necessary "to determine an appropriate reduction in the award to the plaintiff (a reduction that could entirely eliminate the lost profits award)." *Englewood Terrace Ltd. P'ship v. United States*, 479 Fed.Appx. 969, 973 (Fed.Cir.2012) (*Englewood VII* ) (not selected for publication).[2] As stated by the Federal Circuit, the limited issue to be addressed on remand is a possible reduction of Englewood's damages award "by any operational costs or expenses Englewood did not pay but would have been obligated to pay if HUD had not breached the HAP contract." *Id.*

The relevant background and facts of the *Englewood* case have been addressed extensively by this court in its multiple, previous opinions, which, after a lengthy trial, found among other conclusions, that defendant, had breached the 2000 HAP contract it had entered into with Englewood, and that plaintiff was entitled to lost profits damages as a result of the defendant's breach. *See Englewood II*, 79 Fed.Cl. 516; *Englewood V*, 94 Fed.Cl. 116. The relevant facts also were addressed on appeal in the opinion issued by the Federal Circuit. *See generally Engle-*

*wood VII*, 479 Fed.Appx. 969. The findings of fact previously made by this court and the Federal Circuit are incorporated into this opinion with additional findings of fact based on this court's review after the remand. Only the most relevant facts previously found are briefly reiterated below, including those specifically related to calculating "an appropriate reduction in the award to the plaintiff," as mandated by the Federal Circuit. *Id.* at 973. The court also, once again, has reviewed the trial record, as well as the submissions of the parties on remand.

## FINDINGS OF FACT

Englewood alleged, and both this court and the Federal Circuit agreed, that HUD breached the HAP contract between Englewood and HUD. The HAP contract provided for rent subsidies to be used by the tenants of South Pointe Towers (South Pointe), a high-rise apartment building in Chicago, Illinois. South Pointe was owned by Englewood Towers Limited Partnership. John J. Hayes was president of P.M. Group, Englewood Terrace Limited Partnership's general partner, until December 13, 2002. Mr. Hayes' P.M. One was the managing agent at South Pointe. On December 13, 2002, DSSA New Englewood Terrace LLC (DSSA), a sole proprietorship of Donald S. Samuelson, replaced P.M. Group as Englewood's general partner. Earlier, on December 1, 2001, Mr. Samuelson's DSSA Management, Inc., which was affiliated with Mr. Samuelson's DSSA New Englewood Terrace LLC, replaced P.M. One as South Pointe's managing agent.

The HAP contract at issue was executed in October 2000 and called for a one year term, followed by three automatic one-year renewals, which would have continued the contract through September 2004.[3] This court previ-

---

**2.** The first *Englewood* opinion was an opinion issued by Judge Victor J. Wolski, the original Judge assigned to the case. *See Englewood Terrace Ltd. P'ship v. United States*, 61 Fed.Cl. 583 (2004) (*Englewood I* ). Subsequently, the case was re-assigned to the undersigned Judge, who issued *Englewood Terrace Limited Partnership v. United States*, 79 Fed.Cl. 516 (2007) (*Englewood II* ), *Englewood Terrace Limited Partnership v. United States*, 84 Fed.Cl. 649 (2008) (*Englewood III* ), *Englewood Terrace Limited Partnership v. United States*, 86 Fed.Cl. 720 (2009) (*Englewood IV* ), *Englewood Terrace Limited Partnership v.*

*United States*, 94 Fed.Cl. 116 (2010) (*Englewood V* ), *aff'd in part, rev'd in part and remanded*, 479 Fed.Appx. 969 (Fed.Cir.2012), and *Englewood Terrace Limited Partnership v. United States*, 96 Fed.Cl. 614 (2011) (*Englewood VI* ). In 2012, the United States Court of Appeals for the Federal Circuit issued *Englewood VII*, 479 Fed.Appx. 969. This opinion on remand is *Englewood VIII*.

**3.** As indicated in this court's previous opinions, Englewood and HUD first executed a HAP contract for South Pointe in 1998, and the 1998 HAP contract's one-year term was October 1, 1998

ously found that, in December 2000, HUD unilaterally amended the HAP contract, without Englewood's authorization, into one consisting of a series of short term agreements with no automatic renewals. The short term agreements permanently ended on September 30, 2002, after the final short term agreement expired and all tenants had been given housing vouchers permitting them either to remain at South Pointe, or to relocate to other housing with their vouchers. This court found that HUD "should be held to the terms of the original HAP contract it made in October, 2000." *Englewood II*, 79 Fed.Cl. at 535.

Englewood's original claims stemmed from HUD's termination of Englewood's HAP contract with HUD. HUD based its termination of the HAP contract on its finding in a March 2, 2001 HUD inspection of South Pointe that Englewood had not provided decent, safe, and sanitary housing to tenants, as required by the HAP contract. After lengthy trial proceedings, this court found that HUD's decision to terminate Englewood was made even before HUD had received Englewood's plan to correct deficiencies identified in the March 2, 2001 HUD inspection. The court concluded that Englewood had not been afforded a full and meaningful opportunity to cure the deficiencies identified in the March 2, 2001 HUD inspection. The record reflects that, although HUD had urged that South Pointe be placed under new ownership and management, once new management and ownership was in place, under the direction of Mr. Samuelson, there appeared to be a

reluctance on the part of HUD to provide a meaningful opportunity for the new ownership and management to take corrective action. HUD also was unwilling to acknowledge any improvement at South Pointe after DSSA took over. HUD's actions, thereby, undermined its contract termination action against Englewood.

On October 1, 2001, Edward Hinsberger, Director of the Chicago Office of Multifamily Housing for HUD, sent an email to Mr. Hayes and Mr. Samuelson stating that "[t]he [Chicago] Housing Authority has advised us that they will begin issuing vouchers for the residents at South Pointe today.... As a result, the Sec. 8 [HAP] contract will be terminated once all of the residents receive their vouchers." Mr. Hinsberger alleged at trial that vouchers did not begin to issue until June 2002.

The occupancy rate at South Pointe began to decline in the spring of 2002. It dropped below 85% in April 2002 and below 70% by June 2002. It continued to decrease steadily through October 2002, the month following the expiration of the HAP contract, when the occupancy rate dwindled to 35%. HUD phased out the HAP contract in stages. Whenever a tenant used the Chicago Housing Authority (CHAC) voucher, either to leave, or, if the unit was acceptable, to remain at South Pointe, HUD ceased to pay a HAP subsidy for that specific unit. HUD also permanently stopped HAP payments when a unit that had received the subsidy became vacant for any other reason.[4] Dur-

---

through September 30, 1999. The 1998 HAP contract was renewed in 1999, for the one-year term of October 1, 1999 through September 30, 2000, and all of the provisions of the 1998 HAP contract remained unchanged for the 1999 HAP contract, except for the rent adjustment provisions. For the 2000 HAP contract, the provisions of the expiring 1999 contract again were renewed between HUD and Englewood, with adjustments to the rent provisions, and the term in the 2000 HAP contract was for one-year, from October 1, 2000 through September 30, 2001. Unlike the 1998 and 1999 HAP contracts, however, the 2000 HAP contract also stated that: "After expiration of the initial term, this Contract shall renew automatically for 3 additional one-year terms, subject to the availability of appropriations in any year." Additionally, for the 2000 HAP contract, Englewood also agreed to an ad-

dendum to the HAP contract, as a condition of renewal, which stated that:

> in the event HUD's Real Estate Assessment Center (REAC) issues a physical inspection report to the Owner that has a score which evidences Owner failure to comply with HUD's Uniform Physical Condition Standards and Physical Inspection Requirement, ... HUD may terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies or if the Owner fails to perform under an approved Correction Action Plan to Repair.

*Englewood II*, 79 Fed.Cl. at 519.

**4.** A HAP contract is building specific, and by living in a building that has a HAP contract, an eligible tenant receives subsidized rent. A CHAC voucher, on the other hand, can be used by the

ing this time, the costs to run South Pointe remained constant for Englewood, and it continued to pay high interest payments on its loan from Community Investment Corporation (CIC).

In January 2002, Englewood defaulted on its CIC loan. CIC filed a foreclosure action, which was voluntarily withdrawn in March 2002, and then reinstated in May 2002. CIC withdrew the action a second time after it received assurances that Englewood would obtain a new loan, insured by HUD, which would pay off the entire old mortgage and provide funds for a complete rehabilitation of South Pointe. This second loan was provided through Reilly Mortgage, a private financial institution, but was insured against default by HUD through the section 221(d)(4) loan program.[5] The section 221(d)(4) loan program, according to the HUD website, requires the property owner to use the loan funds for new construction or "substantial rehabilitation." *Mortgage Insurance for Rental and Cooperative Housing: Section 221(d)(3) and Section 221(d)(4)*, http://www.hud.gov/offices/hsg/mfh/progdesc/rentcoophsg221d3n4.cfm. The Project Development Office of HUD closed on the Englewood HUD-insured loan in December of 2002. At this time, Englewood also received an additional loan of $750,000.00 from the Illinois Housing Development Authority (IHDA).

In the spring of 2004, after depleting all the funds loaned to it, Englewood defaulted on the HUD-insured, section 221(d)(4) mortgage. · Reilly Mortgage, which had made the loan, replaced DSSA Management Inc., Mr. Samuelson's management company, and assumed responsibility for management of South Pointe on May 21, 2004. Reilly Mortgage instituted an action in the Cook County, Illinois Court for the appointment of a receiver and for the foreclosure of South Pointe. In July 2004, South Pointe was placed under court ordered receivership, and Reilly assigned the mortgage to HUD, which

eventually sold the mortgage at auction to a private party in 2005.

## PRIOR PROCEEDINGS

Subsequent to the filing of the complaint in the court, during the extensive discovery, and after lengthy trial proceedings, the court issued a series of opinions, listed above. The remand primarily implicates *Englewood V*. In *Englewood V*, this court focused on plaintiff's damage claims stemming from HUD's previously found breach of the HAP contract. Plaintiff requested two types of relief: an award of damages for the revenue lost when the government breached the HAP contract, and an award of damages for equity lost when plaintiff defaulted on its mortgage and ceased to own South Pointe. This court held, and the Federal Circuit affirmed, that plaintiff had "not met the burden of proof for any prong of the lost equity damages test," and that "plaintiff's claim for lost equity damages is far too remote and speculative to allow recovery." *Englewood V*, 94 Fed.Cl. at 134; *see also Englewood VII*, 479 Fed.Appx. at 972. This court further found, and the Federal Circuit affirmed, that "Englewood can recover damages due to the breach of the HAP contract." *Englewood V*, 94 Fed.Cl. at 129; *see also Englewood VII*, 479 Fed.Appx. at 972. This court concluded that, "[t]he plaintiff is entitled to recover damages starting on July 1, 2002, through the end of the contract on September 30, 2004. The occupancy rate of South Pointe is assumed to be 97% for the first five months and 90.5% for the remaining twenty-two months." *Englewood V*, 94 Fed.Cl. at 129–30. The Federal Circuit affirmed both the dates of the damages period and the vacancy rate used to calculate damages. *See Englewood VII*, 479 Fed.Appx. at 972. The only determination of this court not affirmed by the Federal Circuit was the calculation of Englewood's lost profits as a result of HUD's breach of the

tenant anywhere the CHAC has approved its use. When a tenant elected to use its voucher, even if it was at South Pointe, Englewood ceased to receive a HAP subsidy from HUD and, instead, received a voucher payment from the CHAC.

5. The program is pursuant to the National Housing Act, codified at 12 U.S.C. § 1715l (2006). Program regulations and eligibility requirements are found at 24 C.F.R. § 221.501 (current through Nov. 14, 2013).

HAP contract, which the Federal Circuit ordered must be recalculated. *Id.*

Discovery in this case was long and difficult. The parties, especially the plaintiff, were afforded lengthy, and repeated, pre-trial discovery opportunities. When Mr. Samuelson offered trial testimony regarding plaintiff's damages during the first phase of trial in January 2007, defendant objected that plaintiff was presenting only documents of a demonstrative nature to the court, without supporting documentation. The court allowed plaintiff to defer Mr. Samuelson's testimony to a later phase of the trial in order to allow Mr. Samuelson yet another opportunity to locate better documentation. The trial reconvened in February 2007, at which time Mr. Samuelson testified and alleged that he had "looked for, and found, the backup documentation that supported all the revenue numbers" in Englewood's general ledgers for the years 2002, 2003, and 2004, and the receiver reports for June, July, August, and September 2004. Mr. Samuelson testified that the general ledgers were "the normal way in which we [Englewood] kept our records."

After trial, this court calculated lost profit damages as "Lost Revenue" by determining "the Potential Revenue less the Actual Revenue received." *See Englewood V*, 94 Fed.Cl. at 130.[6] The values of potential revenue were based on the original terms of the 2000 HAP contract. This court found, and the Federal Circuit later agreed, that the damages period began on July 1, 2002. *See id.* at 126. This court in *Englewood V* stated: "[T]he potential revenue for the months of October 2001–June 2002 is $0, as the court has held that the plaintiff cannot begin to recover until July 2002; the potential revenue for July 2002–November 2002 is $216,736.00; the potential revenue for December 2002–September 2004 is $202,212.00." *Id.* (footnote omitted). This court first calculated the total potential revenue by taking the number of bedroom units identified in the HAP contract: sixty one bedroom units at $648.00; seventeen two bedroom units at $799.00; 140 two bedroom units at $727.00; six three bedroom units at $866.00; and eighty three bedroom units at $800.00, and then multiplied the contract rent to determine the total monthly rent:

| Number of Units | Number of Bedrooms | Contract Rent ($) | Total Monthly Rent ($) |
|---|---|---|---|
| 60 | 1 | 648.00 | 38,880.00 |
| 17 | 2 | 799.00 | 13,583.00 |
| 140 | 2 | 727.00 | 101,780.00 |
| 6 | 3 | 866.00 | 5,196.00 |
| 80 | 3 | 800.00 | 64,000.00 |
| | | | **223,439.00** |

Using the HAP contract, the court concluded that the potential rent revenue for each month, at 100% occupancy, was $223,439.00. *See id.* The court then deter-

---

**6.** Before calculating the lost profit damages, in *Englewood V*, this court noted that:

> It is important to note that in its HAP contract damages claim Englewood is not asking the government to reimburse it for costs it incurred due to the breach, it is only asking for the HAP revenue it lost. From the record it is evident that Englewood had to pay additional costs out of pocket due to the breach of the HAP contract, although it had stopped receiving management fees. Expenses due to the breach appear to have been greater than those that would have been incurred absent the breach. Defendant is liable for damages it caused to plaintiff when it breached the HAP

> contract and cannot now avoid that obligation because plaintiff did not make payments to other third parties, arguably as a result of the lack of a HAP contract. As this award of HAP contract damages will not place plaintiff in a better position than it would have been without the breach, this court does not believe plaintiff's failure to deduct those expenses listed by the government should prevent plaintiff from recovery.

*Englewood V*, 94 Fed.Cl. at 128. The court concluded in *Englewood V*, therefore, "that Englewood can recover damages due to the breach of the HAP contract." *Id.* at 129.

mined what occupancy rate was appropriate for the July 2002–November 2002 period and the December 2002–September 2004 period. The court, recognized plaintiff's argument that South Pointe's historical vacancy rate had ranged from 1.3%–3%, and for the three previous years when Englewood had received the benefits of a HAP contract, the occupancy rate averaged 97.7%. Therefore, "the 97% rate of occupancy argued for by plaintiff was appropriate before plaintiff began substantial rehabilitation on South Pointe." *Id.* at 128. For the December 2002–September 2004 period, the court recognized defendant's argument that "that construction on two floors of South Pointe, necessitated by the terms of the loan, would have occasioned at least a 9.4% vacancy," because South Pointe had twenty-one floors of units: twenty floors of apartments and one level of two-story townhouses, and nineteen floors occupied out of twenty-one equals 90.5% occupancy (19/21 = .9048). Therefore, the court concluded that,

"from December 2002 (the month the loan was finalized) until the end of the contract, it should be assumed that two floors remained unoccupied (9.5% vacancy or 90.5% occupancy) for the purpose of calculating damages." *Id.* To determine the potential revenue for July 2002–November 2002, the court multiplied the total potential revenue by the pre-loan occupancy rate ($223,439.00 × .97), for a total of $216,736.00, and to determine the potential revenue for December 2002–September 2004, the court multiplied the total potential revenue by the loan occupancy rate ($223,439.00 × .905), for a total of $202,212.00. The court concluded that the HAP contract damages were $3,272,217.00. *See id.* at 134. As noted above, the Federal Circuit affirmed both the dates of the damages period and the vacancy rate calculations. *See Englewood VII,* 479 Fed.Appx. at 972.

The basis for the court's calculation was:

| Englewood's Lost HAP Revenue by Month | | | |
|---|---|---|---|
| Month | Potential Revenue | Actual Revenue[7] | Lost Revenue |
| October 2001 | $0.00 | $218,197.00 | $0.00 |
| November 2001 | $0.00 | $213,417.00 | $0.00 |
| December 2001 | $0.00 | $223,439.00 | $0.00 |
| January 2002 | $0.00 | $194,297.00 | $0.00 |
| February 2002 | $0.00 | $221,771.00 | $0.00 |
| March 2002 | $0.00 | $201,690.00 | $0.00 |
| April 2002 | $0.00 | $180,870.00 | $0.00 |
| May 2002 | $0.00 | $181,300.00 | $0.00 |
| June 2002 | $0.00 | $149,977.00 | $0.00 |
| July 2002 | $216,736.00 | $128,065.00 | $88,671.00 |
| August 2002 | $216,736.00 | $113,617.00 | $103,119.00 |
| September 2002 | $216,736.00 | $133,055.00 | $83,681.00 |
| October 2002 | $216,736.00 | $75,576.00 | $141,160.00 |
| November 2002 | $216,736.00 | $67,742.00 | $148,994.00 |
| December 2002 | $202,212.00 | $83,561.00 | $118,651.00 |
| January 2003 | $202,212.00 | $79,103.00 | $123,109.00 |
| February 2003 | $202,212.00 | $73,661.00 | $128,551.00 |
| March 2003 | $202,212.00 | $68,882.00 | $133,330.00 |
| April 2003 | $202,212.00 | $77,249.00 | $124,963.00 |
| May 2003 | $202,212.00 | $80,227.00 | $121,985.00 |
| June 2003 | $202,212.00 | $74,396.00 | $127,816.00 |
| July 2003 | $202,212.00 | $73,746.00 | $128,466.00 |
| August 2003 | $202,212.00 | $82,308.00 | $119,904.00 |
| September 2003 | $202,212.00 | $71,125.00 | $131,087.00 |
| October 2003 | $202,212.00 | $83,714.00 | $118,498.00 |
| November 2003 | $202,212.00 | $96,326.00 | $105,886.00 |
| December 2003 | $202,212.00 | $111,539.00 | $90,673.00 |
| January 2004 | $202,212.00 | $99,712.00 | $102,500.00 |
| February 2004 | $202,212.00 | $85,058.00 | $117,154.00 |
| March 2004 | $202,212.00 | $102,886.00 | $99,326.00 |
| April 2004 | $202,212.00 | $72,961.00 | $129,251.00 |
| May 2004 | $202,212.00 | $66,916.00 | $135,296.00 |
| June 2004 | $202,212.00 | $67,887.00 | $134,325.00 |
| July 2004 | $202,212.00 | $66,708.00 | $135,504.00 |
| August 2004 | $202,212.00 | $60,647.00 | $141,565.00 |
| September 2004 | $202,212.00 | $63,460.00 | $138,752.00 |
| | | Total | $3,272,217.00 |

**Editor's Note:** The preceding image contains the reference for footnote: [7]

After trial, but before issuing the opinion in *Englewood V,* the court issued an Order on July 15, 2010 noting that for the CHAC vouchers, "neither party cites to primary source documents in the trial exhibits which support its date" for when the CHAC vouch-

7. The defendant did not contest the Actual Revenue values.

ers began to be issued to South Pointe residents. The court, therefore, ordered the parties to file a notice "stating whether the specific date the CHAC vouchers were issued can be found in the current exhibits and the trial testimony, and, if so, where this information can be located." In plaintiff's response, Mr. Samuelson cited to testimony and exhibits in the record he alleged supported his position, but did not request to reopen the record. It was not until after the court's opinion in *Englewood V* was issued that plaintiff sought reconsideration and requested that "the court permit a limited amount of additional testimony to be discovered on the narrow issue of the documentation of the dates on which the South Pointe vouchers were issued."

Following issuance of the trial court's opinion, in *Englewood VI*, the court reviewed plaintiff's motion for reconsideration of *Englewood V*, which plaintiff filed, partly as an attempt to reopen discovery, after plaintiff expressed disappointment with an award of only $3,272,217.00 in HAP contract damages for lost profits.[8] *See generally Englewood VI*, 96 Fed.Cl. 614. As this court wrote in *Englewood VI:*

> Plaintiff seeks to locate and supplement the record with CHAC vouchers in order to reassess the damages awarded. In *Englewood V*, the court awarded plaintiff $3,272,217.00 in HAP contract damages. HAP contract damages were assessed as a function of the issuance of vouchers to tenants, and the subsequent use or exercise of the vouchers. *See Englewood V*, 94 Fed.Cl. at 127. The plaintiff's HAP contract was phased out in stages. When a tenant exercised his or her voucher, Englewood stopped receiving HAP payments for that unit. In *Englewood V*, the court concluded that plaintiff was unable to cite to any exhibit in the record which would reliably inform the court of the specific date on which the vouchers were issued. Moreover, just because a tenant received a voucher did not mean that the voucher was

immediately exercised, thereby impacting HAP payments to Englewood. *Id.*

Plaintiff, unsatisfied with the $3,272,217.00 in HAP contract damages awarded by the court, *id.* at 134, effectively seeks to retry this case. Prior to trial, plaintiff was afforded the opportunity for discovery in support of its case, including damages. Plaintiff had multiple opportunities to introduce exhibits in support of damages at trial, and even to take advantage of a month-long break in the trial to locate additional documents supporting its damages claim. Moreover, after plaintiff rested and the trial record was closed, plaintiff was afforded the opportunity for post-trial briefing, and to identify evidence in the record and present arguments in support of its damages claims.

At trial, plaintiff attempted, through the testimony of Mr. Samuelson, to explain plaintiff's damages exhibits in support of its claim, including lost HAP contract revenues. Plaintiff also had opportunities to explain its argument that the calculation of lost HAP contract revenues should begin on October 1, 2001. The record contains plaintiff's chart titled "Englewood Lost HAP Revenue by Month (2001–2004)" in support of plaintiff's view of damages. During his testimony, Mr. Samuelson discussed voucher income, the issuance of housing vouchers, and declining HAP contract revenues. On January 27, 2007, after the close of the direct examination of Mr. Samuelson, plaintiff indicated there would be no witnesses for the plaintiff, other than Mr. Samuelson.

Defendant objected to the absence of supporting data for plaintiff's figures on HAP contract damages, and for a variety of reasons, and in an abundance of generosity, after presentation of the defendant's case, the court adjourned the trial for a month, during which time Mr. Samuelson was afforded an opportunity to gather his backup records in support of the damages summaries he had offered at trial. Mr. Samuelson was scheduled to retake the

---

8. The court notes that motions for reconsideration are not new to this case. After *Englewood I* was issued defendant filed a motion for reconsideration, which was denied. Likewise, plaintiff filed a motion for reconsideration after the court issued *Englewood III*, which was denied in *Englewood IV*. *See generally Englewood IV*, 86 Fed. Cl. 720.

stand when the trial reconvened a month later, and if he was able to locate damages documentation, he could continue his direct testimony on damages, followed by defendant's cross-examination of Mr. Samuelson.

When the trial reconvened a month later, Mr. Samuelson was the sole witness to retake the stand for additional direct and cross-examination. Mr. Samuelson stated that he had found some documentation to support his lost HAP contract revenue summaries, but not the primary source CHAC vouchers. At this point, plaintiff offered the exhibits Mr. Samuelson had available into evidence, which were admitted without objection from the government. With the conclusion of Mr. Samuelson's additional testimony, both parties rested their cases, and the court closed the record. After the record was closed, the parties were afforded the opportunity to present closing arguments and to submit post-trial briefings. While the court was considering its damages opinion, *Englewood V*, the parties were directed to file a notice to the court, "stating whether the specific dates the CHAC vouchers were issued can be found in the current exhibits and the trial testimony and, if so, where this information can be located." Both parties responded in the negative.

*Englewood VI*, 96 Fed.Cl. at 620–21 (footnotes omitted).

In its decision on appeal, the United States Court of Appeals for the Federal Circuit first found "no error" in this court's

determination that HUD breached the 2000 HAP contract; that July 1, 2002, was an appropriate start of the damages period; that a 9.5% vacancy rate was appropriately used in the calculation of damages; that Englewood had not shown its entitlement to rent increases; that Englewood was not entitled to lost equity damages; and that Englewood was entitled to lost profits as a result of HUD's breach (if there were any lost profits).

*Englewood VII*, 479 Fed.Appx. at 972. The Federal Circuit characterized the lost revenue as "gross revenue," noting that the Court of Federal Claims "awarded Englewood all of the gross revenue it would have received had HUD not breached the HAP contract without concurrently subtracting various costs or expenses that Englewood would have incurred absent breach." *Id.*

The Federal Circuit continued:

HUD identified numerous costs saved by Englewood that it urged should have offset the lost profits damages received by Englewood. HUD asserts that if it had not breached the contract, Englewood would have had to repay the HUD-insured and IHDA loans that it took out in December 2002, along with the property taxes and liability insurance for South Pointe, which HUD argues Englewood did not pay during the breach period in 2003 and 2004. Moreover, HUD argues that had the contract not been breached, Englewood would also have been required to pay South Pointe's operating expenses and to expend money making repairs to South Pointe to maintain its compliance with HUD standards. The Claims Court made no findings as to the amount of costs saved by Englewood, but simply held that there was no need to deduct such costs from Englewood's rent revenue.

The Claims Court erred by failing to deduct costs and expenses Englewood saved, i.e., did not pay, as a result of the breach. An award of gross revenues is not appropriate; this is not the measure of Englewood's loss from HUD's breach. By failing to deduct avoided costs, the Claims Court placed Englewood in a better position than it would have been in had there been no breach.

*Id.* at 972–73 (citations omitted). The Federal Circuit also indicated, "[t]here is, however, no identification or support for such expenses Englewood supposedly expended due to the breach in either the Claims Court's opinion or in Englewood's briefs before this court." *Id.* at 973.

The Federal Circuit stated that on remand, this court should "determine an appropriate reduction in the award to the plaintiff" and acknowledged that such "a reduction ... could entirely eliminate the lost profits award." *Id.* The Federal Circuit concluded:

The Claims Court must reduce the award by any operational costs or expenses Englewood did not pay but would have been obligated to pay if HUD had not breached the HAP contract. These may include mortgage payments, liability insurance, property taxes, and money for repairs and rehabilitation of South Pointe.

*Id.* at 973–74 (footnote omitted). The Federal Circuit noted, in regard to these costs and expenses, "[a]s HUD concedes, if Englewood retained legal obligations to repay these expenses they would not need to be deducted. But HUD contends that it already largely paid these costs itself." *Id.* at 973 n. 2 (internal citation omitted).

After the remand, in compliance with the Federal Circuit's instructions, this court issued an order instructing the parties to prepare a detailed list of the expenses and costs Englewood would have been obligated to pay had HUD not breached the HAP contract. Plaintiff did not submit a list of costs avoided, but instead tried, once again, to reargue plaintiff's case stating that by "[a]pplying Judge Dyk's [9] logic to this case, Englewood should receive as damages the rental revenue it lost as a result of the HUD beach [sic] [gains prevented] and the extra expenses it incurred caused by the breach [losses caused], less savings resulting from the breach." (brackets in original). Defendant responded, and the court agrees, that the mandate from the Federal Circuit is limited to determining an appropriate deduction from the HAP breach damages award, and does not extend to a reassessment of the damages as a whole. Defendant submitted its proposed list of avoided costs and expenses, noting that it had previously argued

for the deductions. *See Englewood V*, 94 Fed.Cl. at 128 ("Defendant argues that lost revenue calculations performed by the court must include deductions for expenses that the recovering party would have incurred. According to the government, the expenses which must be deducted include the money borrowed from IHDA, plus interest; the HUD-insured mortgage for 2003–2004; the liability insurance that Englewood did not pay in December 2003; the property taxes it missed in February 2004; and the amounts of money it would have needed to complete the rehabilitation."); *see also Englewood VII*, 479 Fed.Appx. at 972 ("HUD asserts that if it had not breached the contract, Englewood would have had to repay the HUD-insured and IHDA loans that it took out in December 2002, along with the property taxes and liability insurance for South Pointe, which HUD argues Englewood did not pay during the breach period in 2003 and 2004. Moreover, HUD argues that had the contract not been breached, Englewood would also have been required to pay South Pointe's operating expenses and to expend money making repairs to South Pointe to maintain its compliance with HUD standards.").

In light of the Federal Circuit's specific instructions to only address the amount of any reduction from the $3,272,217.00 damages award for lost profits, this court held a hearing after the remand and subsequently received briefs from the parties. Plaintiff elected not to submit its own list of expense categories to be review, but instead adopted the list of expense categories to be reviewed which was submitted by defendant in defendant's response to plaintiff's opening brief on remand.[10] The categories of expenses and

---

**9.** Judge Dyk was the author of the *Englewood VII* opinion issued by the United States Court of Appeals for the Federal Circuit.

**10.** In plaintiff's response to defendant's opening brief on remand, plaintiff listed a series of bullet points describing "What is the 'Plausible "But-For" World' That Englewood Would Have Experienced by [sic] If HUD Had Not Breached the 2000 HAP Contract?" Plaintiff stated: "Englewood would have been eligible for a rental increase in October 2000," "Englewood would have been eligible for the $139K energy reimbursement funding in September 2001," "Englewood would not have to create and pay for a

marketing plan and staff from October 2001 through May 2004," "Englewood would not have to create and pay for a resident relocation plan and staff from November 2001 through November 2002," and "Englewood would not have had to create and pay for a team of residents to 'trash out' the garbage, furniture and other debris left in units by tenants who took their vouchers and left." Despite the Federal Circuit's instructions, and this court's Order, plaintiff did not include any operational costs or expenses Englewood did not have to pay, but would have been obligated to pay, but for the breach.

costs which the parties agreed to address as plaintiff's potential avoided costs, absent the breach, were as follows: the CIC debt service for the period July 1, 2002 to March 1, 2003; the CIC balloon payment at maturity as of March 1, 2003; the Michigan National Bank loan debt; major repairs to South Pointe, estimated at $3,514,568.00; other routine operating expenses at South Pointe, estimated at $1,830,993.00; real estate taxes estimated in the amount of $250,000.00; insurance payments estimated in the amount of $120,000.00; and the Reilly Mortgage interest payments in the amount of $618,232.00 for interest during construction, and $430,768.08 for principal and interest payments post-construction.

This court also issued an Order allowing for one final opportunity to supplement the record. The Order stated that, "the previously closed trial record will be reopened for the limited purpose of adding limited, additional documents to the record." The court ordered the parties to work together, and instructed the defendant to file "a copy of the closing transcript, the draws of disbursements, and any additional relevant documents which can inform the court regarding plaintiff's operational costs or expenses, as discussed and agreed to at the November 19, 2012 hearing." [11] The court's Order confirmed the understanding to which both parties agreed: "At the hearing, the parties agreed to use the list of relevant categories on page 3 of the defendant's October 5, 2012 brief, on the type of expenses Englewood did, or did not, pay." The parties were ordered in their subsequent briefing to use this list of categories of expenses and identify, "with as much specificity as possible," how much each category of expenses impacted the $3,272,217.00 damages award. Additional documents were submitted and added to the record as exhibits on January 31, 2013 and on February 13, 2013, after which the parties filed a joint status report agreeing that the record was now complete. Between the two filings, almost 2,000 pages were added to the record.

Plaintiff alleges in the briefs submitted to the court after the remand that for each of the categories in the agreed-upon list of expenses, plaintiff either "had no obligation to pay the claimed expense," plaintiff "paid the expense," or plaintiff "retained the legal obligation to repay expenses paid by a third party (i.e. Reilly Mortgage)." Specifically, plaintiff alleges that the entire loan balances for the CIC and Michigan National loans were paid on December 13, 2002, using funds from the Reilly Mortgage loan; that plaintiff had no obligation to make major repairs on South Pointe; and that, in 2003 and 2004, plaintiff used advances from the Reilly Mortgage loan to pay operating expenses, real estate taxes, and insurance payments. Plaintiff asserts that when it received advances from Reilly Mortgage, it was as if Englewood had paid those expense, as Englewood had a legal obligation to repay those advances. Plaintiff concludes "that there should be no deductions from this Court's previous damages award."

Defendant, in its submissions to the court, argues that plaintiff's damages award "should be eliminated or at least reduced significantly." According to defendant, plaintiff "was not damaged because: 1) Englewood's debts were merely re-characterized into the new $11.6 million dollar, HUD-insured mortgage; and, 2) Englewood never made payments on that mortgage; and, 3) HUD paid an insured claim for the entire mortgage and only recovered 20 cents on the dollar when it was sold; and, 4) the Reilly Mortgage was foreclosed; and, 5) Englewood is no longer liable for the mortgage or deficiency because the mortgage note was non-recourse." (internal citations omitted). Defendant also argues that, even if plaintiff can recover damages for expenses paid with the HUD-insured loan, plaintiff has failed to provide evidence that it paid all of the expenses the parties agreed must be addressed.

## DISCUSSION

In remanding the above captioned case to this court, the United States Court of Ap-

---

11. This was the fourth time the court re-opened the record to allow plaintiff to prove its breach damages with specificity. Given the numerous opportunities to complete the record, the court also noted in the Order that "[a]fter the additional documents are included in the record, the record shall be closed, and the court will not entertain motions to reopen the record further."

peals for the Federal Circuit has articulated a variety of related standards to determine damages in a breach situation. In *Englewood VII*, the Federal Circuit stated that, "[a]s a matter of general contract law, an injured party can collect as expectancy damages, i.e., lost profits, 'the loss in value to him of the other party's performance caused by its failure or deficiency, ... less ... any cost or other loss that he has avoided by not having to perform.'" *Englewood VII*, 479 Fed.Appx. at 973 (quoting Restatement (Second) of Contracts § 347 (1981)) (omissions in original). The Federal Circuit in *Englewood VII* also cited the dissenting opinion in *Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328 (Fed.Cir.), *cert. denied*, 540 U.S. 981, 124 S.Ct. 462, 157 L.Ed.2d 370 (2003), noting: "'"[C]ompensatory damages will be given for the net amount of the losses caused and gains prevented, in excess of savings made possible."'" *Id.* at 1344 (Dyk, J., dissenting in part) (quoting Restatement (First) of Contracts § 329 cmt. A (1932)). To derive the proper amount for an award of damages, in *Englewood V*, this court cited to the quotation in *Bluebonnet Savings Bank, F.S.B. v. United States*, 339 F.3d 1341 (Fed.Cir.2003), that "the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach." *Id.* at 1345.

■■■■ As explained by the Federal Circuit in *Anchor Savings Bank, FSB v. United States*:

Damages for breach of contract are designed to make the non-breaching party whole. One way to accomplish that objective is to award "expectancy damages," i.e., the benefits the non-breaching party would have expected to receive had the breach not occurred. *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir.2001). Expectancy damages "are often equated with lost profits, although they can include other damage elements as well." *Id.* To recover lost profits for breach of contract, the plaintiff must establish by a preponderance of the evidence that (1) the lost profits were reasonably foreseeable or actually foreseen by the breaching party at the time of contracting;

(2) the loss of profits was caused by the breach; and (3) the amount of the lost profits has been established with reasonable certainty. *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed.Cir.2005); *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324–25 (Fed.Cir.2002).

*Anchor Savings Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed.Cir.2010). Although a non-breaching party is entitled to an award of damages that would restore the party to the position it would have been in had the contract been performed, the non-breaching party should not be awarded damages that put the party in a better position than it would have been in if the contract had not been breached. *See Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d at 1345 (quoting *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed.Cir. 1997)) ("One of the basic principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.' Thus, the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach."); *see also White v. Delta Constr. Int'l, Inc.*, 285 F.3d 1040, 1043 (Fed.Cir.2002); Restatement (Second) of Contracts § 344(a) (1981).

■■■■ In order for lost profits to be recoverable, "they must flow from the contract that is the subject of the lawsuit and not from 'independent and collateral undertakings.'" *Precision Pine & Timber, Inc. v. United States*, 72 Fed.Cl. 460, 471 (2006) (quoting *Energy Capital Corp v. United States*, 302 F.3d 1314, 1328 (Fed.Cir.2002)), *on recons.*, 81 Fed.Cl. 235 (2007), *recons. in part*, 81 Fed.Cl. 733 (2008), *aff'd in part, rev'd in part and remanded*, 596 F.3d 817 (Fed.Cir.2010). Similarly, when considering expenses a plaintiff saved, or did not pay, as a result of the breach, the savings, as a form of offset, should be "limited to actions reasonably directly related to the breach and its proximate consequences." *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1366 (Fed.Cir.2003); *see also Am. Fed. Bank, FSB v. United States*, 72 Fed.Cl. 586,

610 ("The court then must offset any costs avoided or benefits received as a consequence of the breach.") *recons. denied*, 74 Fed.Cl. 208 (2006), *aff'd*, 295 Fed.Appx. 368 (Fed.Cir.2008); *Tenn. Valley Auth. v. United States*, 69 Fed.Cl. 515, 543 (2006) ("In *Indiana Michigan* [*Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed.Cir.2005) ], the Federal Circuit expressly limited recoverable damages to those that can be 'shown with reasonable certainty.' ... Correlatively, the 'benefits' the government seeks to setoff are too speculative to meet the standards set forth by the Federal Circuit in *Indiana Michigan*, and thus a setoff is denied."); *Bluebonnet Sav. Bank F.S.B. v. United States*, 67 Fed.Cl. 231, 236–37 (2005) ("[O]ffsets typically included losses that the plaintiff would have incurred had the contract been performed ...."), *aff'd*, 466 F.3d 1349 (Fed.Cir.2006). Costs and expenses which the non-breaching party would have incurred in both the breach and non-breach world should not be deducted, as those costs were not "saved" or avoided by the breach. *See, e.g., Sure–Trip, Inc. v. Westinghouse Eng'g*, 47 F.3d 526, 531 (2d Cir.1995) (citations omitted) ("Fixed overhead costs, as opposed to variable costs, are not properly deducted in calculating plaintiff's lost profits.... Fixed costs represent the total dollar expense that occurs regardless of output.").

Avoided costs and expenses are part of the "but-for" world of lost profits, which plaintiff must establish with reasonable certainty. *See S. Nuclear Operating Co. v. United States*, 637 F.3d 1297, 1304 (Fed.Cir.2011) (Noting that the burden to establish a but-for world, "with respect to both claimed costs and avoided costs, plaintiffs bear the burden of persuasion," and "this burden extends to avoided costs...."). This court employed a substantial factor test in determining HAP contract damages, *Englewood V*, 94 Fed.Cl. at 124. " 'Because plaintiffs ... are seeking expectancy damages, it is incumbent upon them to establish a plausible "but-for" world.' " *S. Nuclear Operating Co. v. United States*, 637 F.3d at 1304 (quoting *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268, 1273 (Fed.Cir. 2008)) (alteration in original); *see also Stock-*

*ton E. Water District v. United States*, 109 Fed.Cl. 760, 781 (2013) ("Regardless of the causation standard applied, the Federal Circuit has held that it is incumbent upon [a plaintiff seeking expectancy damages] to establish a plausible 'but-for' world." (brackets in original; internal quotations omitted)); *Sacramento Mun. Util. District v. United States*, 109 Fed.Cl. 660, 682 (2013); *Bluebonnet Sav. Bank F.S.B. v. United States*, 67 Fed.Cl. at 238 ("[B]ecause plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for' world."). In *Southern Nuclear Operating Co. v. United States*, the Federal Circuit explained that the " 'party incurring the relevant costs is in the best position to adduce and establish such proof,' " *S. Nuclear Operating Co. v. United States*, 637 F.3d at 1304 (quoting 11 Arthur L. Corbin & Joseph M. Perillo, Corbin on Contracts § 57.10 n. 15 (rev. ed. 2005)), and the "plaintiffs are in the best position to determine both the costs they would have incurred and the costs they would have avoided," although a defendant may be called upon to "point[ ] out the costs it believes the plaintiff avoided because of its breach." *Id.* (citing *Mech–Con Corp. v. West*, 61 F.3d 883, 886 (Fed.Cir. 1995); 11 *Corbin on Contracts* § 57.10). Even if defendant contributes to the determination of avoided costs, however, plaintiff ultimately bears "the burden of demonstrating 'what might have been.' " *Bluebonnet Savings Bank F.S.B. v. United States*, 67 Fed.Cl. at 238 (quoting *Glendale Fed. Bank FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001)).

As noted above, the Federal Circuit directed that on remand this court should reduce the lost profit award "by any operational costs or expenses Englewood did not pay but would have been obligated to pay if HUD had not breached the HAP contract." *Englewood VII*, 479 Fed.Appx. at 973. A corollary of the Federal Circuit's mandate is that, in seeking expectation damages, if plaintiff does not establish the "but-for" world, plaintiff will be unable to recover its expectation damages. In *Glendale Federal Bank, FSB v. United States*, the Federal Circuit acknowledged that, "[t]he problems of

proof attendant on the burden placed on the non-breaching party of establishing lost profits—on establishing what might have been—are well recognized. Even with a generous standard of proof applied in such cases, *see, e.g., San Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d 1557, 1563 (Fed. Cir.), *reh'g denied* (Fed.Cir. 1997); *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961), the proof problems can in some situations prove to be insurmountable." *Glendale Fed. Bank, FSB v. United States,* 239 F.3d at 1380. If plaintiff is unable to establish evidence of costs it would have been obligated to pay in a "but for" world, the court will not be able to assess plaintiff's damages award. *See Kansas Gas and Elec. Co. v. United States,* 685 F.3d 1361, 1371 (Fed.Cir.2012) ("Without record evidence about the research costs in both worlds, the trial court could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the damages.... Thus, the Court of Federal Claims did not err in disallowing damages."); *see also Stockton E. Water District v. United States,* 109 Fed.Cl. 460, 494 (2013) (finding that plaintiff was not entitled to expectancy damages because plaintiff had failed to establish evidence of the "but-for" world); *Yankee Atomic Elec. v. United States,* 536 F.3d at 1273 ("Without record evidence about the Yankees' condition with full Government performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the Yankees' damages.").

This court has given the plaintiff at least four separate opportunities, over many years, to gather and submit to the court documentation that would establish its claims (during discovery prior to trial, during the suspension of trial when Mr. Samuelson's testimony was deferred so that he could search for and provide further evidence, prior to issuing *Englewood V,* and now after the case was remanded to this court by the Federal Circuit). The court continued to give plaintiff these opportunities because the court found that HUD had breached the HAP contract and that plaintiff was entitled to damages resulting from that breach. *See Englewood V,* 94

Fed.Cl. at 134. As was demonstrated to this court by plaintiff throughout the pre-trial, trial, and post-trial proceedings, plaintiff's record-keeping, retention, and presentation has been limited, scattered and disorganized, despite the numerous opportunities provided by the court to bring plaintiff's evidence together in a proper evidentiary form for presentation in this court.

Plaintiff must establish a plausible "but-for" world, or in other words, a world in which HUD honored the original HAP contract through September 30, 2004. On remand, in accordance with the Federal's Circuit's instructions, the court's consideration is limited to reviewing "any operational costs or expenses Englewood did not pay but would have been obligated to pay" if HUD had not breached the HAP contract in the "but for" world. *Englewood VII,* 479 Fed. Appx. at 974. The Federal Circuit indicated that the operational costs or expenses may include mortgage payments, liability insurance, property taxes, and money for repairs and rehabilitation of South Pointe. The Federal Circuit noted, in regard to these costs and expenses, "[a]s HUD concedes, if Englewood retained legal obligations to repay these expenses they would not need to be deducted. But HUD contends that it already largely paid these costs itself." *Id.* at 973 n. 2 (internal citation omitted). As more fully explained in its brief before the Federal Circuit, the government stated:

In the Government's initial brief, we noted that HUD had already paid the expenses that Englewood would have used the HAP contract revenue to pay, because HUD as the mortgage insurer had to repay the lender when Englewood defaulted on its loan. This included the mortgage principal, the mortgage interest, the advanced property taxes, and the advanced insurance. HUD, therefore, has already paid the expenses for South Pointe that Englewood would have needed to pay to gain the benefits of the HAP contract in 2002, 2003, and 2004.

Englewood ignores this point, because it has no defense to it. Instead, Englewood poses a hypothetical, stating that B's failure to pay X and Z does not relieve A of

its obligation to pay B. This would make sense, if B retained legal obligations to repay X and Z, as B would not have escaped any payments as a result of the default. However, Englewood's hypothetical ignores that it did escape the obligation to pay X and Z, obligations it would have needed to incur to obtain the benefits of the HAP contract. In this case, A (HUD) satisfied the obligations of B (Englewood) to X (Reilly Mortgage, the HUD-insured mortgagee).

Thanks to HUD's payments, Englewood avoided the costs of making the mortgage payments, as well as the property tax and insurance payments, and faced no liability from those creditors. Englewood, therefore, avoided the payments it would have needed to make to keep receiving the monthly HAP revenue in 2002, 2003, and 2004, and will not be sued by the creditors.

(internal citations omitted).

Because the parties agreed to the list of eight expense categories to be reviewed, the court specifically addresses those costs as they pertain to calculating the appropriate reduction, if any, of the damages award, in light of the United States Court of Appeals for the Federal Circuit's instructions on remand. As indicated above, the eight categories are the CIC debt service from July 1, 2002 to March 1, 2003; the CIC balloon payment at maturity as of March 1, 2003; the Michigan National Bank loan debt; major repairs to South Pointe, estimated at $3,514,568.00; routine operating expenses at South Pointe estimated at $1,830,993.00; real estate taxes estimated in the amount of $250,000.00; insurance payments estimated in the amount of $120,000.00; and the Reilly Mortgage interest payments, payments estimated in the amount of $618,232 for interest during construction, and $430,768.08 for principal and interest payments post-construction.[12]

Six of the eight categories—the CIC debt service, the CIC balloon payment, the Michi-gan National loan debt, the real estate taxes, the insurance payments, and the Reilly Mortgage interest payments—were expenses that the parties agree were paid in their entirety by the Reilly Mortgage loan. This court previously determined in *Englewood V* that the HUD-insured Reilly Mortgage loan was a separate transaction from the HAP contract. In *Englewood V*, this court stated that "[t]he record reflects Englewood had been attempting to obtain a section 221(d)(4) loan insured by HUD for the purpose of performing substantial rehabilitation since 1999," as Englewood had applied for a HUD-insured loan in 1999, twice in 2001, and again in 2002. *Englewood V*, 94 Fed.Cl. at 128. Furthermore, this court found in its analysis of Englewood's claim of lost equity that "attempts to connect the foreclosure of the [HUD-insured] loan to the breach of the HAP contract are far too speculative." *Id.* at 133. Regarding the damages calculations, defendant argued that there were "numerous other methods by which Englewood was predestined to lose South Pointe, regardless of the status of the HAP contract." In *Englewood V*, this court stated that "taking out the $11.6 million loan which Englewood used to rehabilitate South Pointe, a property which it eventually lost due to foreclosure of the same loan, did not place Englewood in a better position than it would have been with the continuation of the HAP contract." *Id.* at 129. It, therefore, is possible that the payments tied directly to the HUD-insured Reilly Mortgage loan, such as the interest on the Reilly Mortgage loan itself, should not be deducted from plaintiff's damages award. Plaintiff, however, has failed to produce sufficient, reliable evidence to demonstrate that Englewood did, in fact, make payments on any of these expenses or on the Reilly Mortgage loan.

The CIC debt service and the CIC balloon payment have been consolidated into one category by the parties, as the entire CIC loan was paid by the HUD-insured Reilly Mortgage on December 13, 2002. Defendant orig-

---

12. Although the Federal Circuit noted defendant's assertions on appeal that, "if it had not breached the contract, Englewood would have had to repay the HUD-insured and IHDA loans that it took out in December 2002, along with the property taxes and liability insurance for South Pointe," as well as the operating expenses and repairs, *Englewood VII*, 479 Fed.Appx. at 972, the Federal Circuit made "no determination as to which of these items should be deducted, leaving that determination to the Claims Court in the first instance." *Id.* at 974.

inally suggested that the CIC loan debt service would have been approximately $600,000.00 from July 1, 2002 to March 1, 2003, based on the debt service for 2001, and that the balloon payment "would likely have been at least $1,559,278.88 plus accrued interest, late charges and fees." After the closing documents from the Reilly Mortgage were entered into the record, defendant noted that "[t]he payoff amount to CIC was in fact $1,743,293.49 in December 2002."

After the parties stipulated that "the record for the remand proceedings now is complete and that record is now closed," and after reviewing defendant's initial filings on remand, plaintiff again asserts that it paid the "entire [CIC] loan balance on December 13, 2002, plus accrued interest, late charges and fees, a total of $1,743,293.49." Plaintiff further asserts that the "evidence of plaintiff's satisfaction of this obligation" is the December 9, 2002 payoff letter from CIC, the loan closing statement reflecting the total payment, and the "Owner's Sworn Statement." Plaintiff argues that "[s]ince plaintiff paid off the CIC loan ... there was no loan balance due CIC," and that "[b]y paying off all of its obligations to CIC on December 13, 2002, Englewood had no further obligation to make interest payments to CIC from December 13, 2002 to March 1, 2003." By contrast, defendant argues that "the CIC note was scheduled to mature on March 1, 2003. Accordingly, Englewood would have had to pay the entire balloon balance owed on the CIC mortgage note during the damages period." (internal citations omitted).

Similarly, both parties agree that the Michigan National loan was paid in full on December 13, 2002, at the closing of the Reilly Mortgage loan. The record now contains a payoff letter from Standard Federal [13] on December 10, 2002, the loan closing statement reflecting payment of $765,237.56 to Standard Federal, and the "Owner's Sworn Statement," also showing the payment of $765,237.56. Plaintiff, however, argues that "[s]ince plaintiff paid off this loan, there was no loan balance due Standard Federal, and

there should be no deduction of this amount from the plaintiff's damages award." Defendant argues, however, that the debt was paid by funds from the Reilly Mortgage loan, and not by Englewood, and, therefore, should be deducted from the damages award.

In addition to the payment of the CIC and Michigan National loans, the record reflects that past due real estate taxes in the amount of $120,567.99 were paid as part of the closing of the Reilly Mortgage loan, with an additional $250,000.00 allocated for taxes during construction, which was used to pay real estate taxes in 2003. Reilly Mortgage also advanced $129,628.00 to pay real estate taxes in February 2004. Defendant, therefore, argues that a total of $500,195.99 for real estate taxes should be deducted from plaintiff's damages award. Plaintiff again argues that "Englewood remained liable for the advances that Reilly made for real estate taxes in 2004.... Therefore, there is no basis for deducting any costs for real estate payments from Englewood's damages award." Plaintiff further argues that the funds advanced by Reilly Mortgage to pay the real estate taxes were part of $750,000.00 provided by Englewood to the mortgage, however, the Loan Closing Statement shows that $750,000.00 was not a contribution Englewood made directly to Reilly Mortgage, but was the amount loaned by IHDA. The record also shows that insurance payments for 2003 were made by funds advanced by Reilly Mortgage in the amount of $154,579.00. Additional funds in the amount of $87,082.03 were advanced to pay insurance through December 2004. Plaintiff argues that Englewood paid $241,661.03 in insurance expenses through Reilly Mortgage, and there should not be any deduction from the damages related to insurance payments. Defendant, however, argues that the total amount of insurance payments made by funds advanced from Reilly Mortgage, $241,661.03, should be deducted from the plaintiff's damages award.

Finally, the parties addressed the interest due on the Reilly Mortgage loan, which was paid by advances from Reilly Mortgage. De-

---

**13.** Defendant indicated that Michigan National Bank merged with Standard Federal Bank in late 2001, which accounts for the discrepancy in the junior-mortgage holder being Standard Federal, instead of Michigan National, in the Reilly Mortgage closing documents.

fendant argues that Englewood failed to introduce evidence that it paid "Reilly Mortgage interest payments amounting to $618,232 for interest during construction, and $430,768.08 for principal and interest payments post-construction." (internal citations omitted). Plaintiff responds that "Englewood made $556,205 in construction period interest payments by the end of April 2004," and acknowledges that "[i]t had borrowed $618,232 to make these payments," as part of the financial requirements for closing. Plaintiff further alleges that "there was $62,027 [14] left in the construction period interest account when Reilly assumed control of the property the week of May 21, 2004." Regarding the $430,768.08 for principal and interest payments on the Reilly Mortgage loan after the completion of construction, plaintiff argues that, per the "Commitment for Insurance Advances," payment on the principal "would not begin until the fourth month following the completion of construction." Plaintiff argues that, at most, there would have been interest payments made from May through September 2004, amounting to approximately $217,276.00,[15] but also argues that "since Englewood remained legally liable for the payment of proper post-construction interest charges, ... these costs should not be deductions from Englewood's damages award." In response, defendant notes that "[t]he problem of course is that Englewood is not responsible for the Reilly Mortgage (it defaulted on the mortgage) and HUD insured Reilly for Englewood's default. Englewood's obligations were effectively 'waived or given away or didn't come into being' because HUD paid those debts. By ignoring this in its damages calculations, Englewood asks the Court to compel the Government to pay again. Thus, requiring the Government to reimburse Englewood for this alleged debt would put Englewood in a better position than it would have been in had there been no breach." (internal citations omitted).

 The total amount of costs defendant claims plaintiff avoided because the expenses were paid solely by funds advanced from Reilly Mortgage is $4,299,388.15, or more than the entire amount of the damages award.[16] Plaintiff asserts that none of the categories paid by funds from the Reilly Mortgage loan should be deducted from plaintiff's damages awards because plaintiff "paid" those expenses, as it remained legally obligated to repay the mortgage during the damages period from July 2002 to September 30, 2004. For each category that was paid in full by funds from Reilly Mortgage loan, plaintiff argues that Englewood paid that obligation through funds advanced by Reilly Mortgage. As indicated above, however, to establish a "but-for" world of avoided costs, plaintiff must provide proof that Englewood either paid the expenses itself, or made payments to Reilly Mortgage. Although plaintiff has presented records of expenses in the form of Englewood's general ledgers, there are no entries or other reliable documents indicating that Englewood made payments to

14. Although the difference between the $618,232.00 that plaintiff claims was part of the financial requirements for closing and the $556,205.00 paid in interest by May 2004 is $62,027.00, on a page later, in the same section of plaintiff's brief, plaintiff states that, "Englewood had disbursed $556,205 in construction period interest by the end of April 2004.... There was $62,066 in construction period interest left in the loan as of April 30, 2004."

15. Plaintiff arrives at this number by using the April 2004 interest payment of $56,627.00 for July 2004, August 2004, and September 2004, plus the accrued interest for May and June 2004 as stated in "Englewood's Answer and Defenses to Plaintiff Mortgagee's First Amended Complaint," less the amount plaintiff claims was still available in its capitalized interest account, $62,007.00. Although plaintiff cites to "Engle-

wood's Answer and Defenses to Plaintiff Mortgagee's First Amended Verified Complaint," filed in the Chancery Division of the Circuit Court of Cook County, Illinois on October 12, 2005 to establish that interest for May and June 2004 was $109,401.70, in Englewood's Answer, plaintiff also states that "Englewood does not have sufficient information to either admit or deny ... that the accrued interest was $109,401.70."

16. The final CIC payment was $1,743,293.49. The payoff of the Standard Federal loan was $765,237.56. A total of $500,195.99 was paid for real estate taxes, and $241,661.03 for insurance. Finally, funds were borrowed to make the Reilly Mortgage loan interest payments in the amount of $618,232.00, and defendant argues that an additional $430,768.08 would have been due in principal and interest payments after construction was completed.

Reilly Mortgage.[17]

In addition to the categories of expenses paid entirely by funds from the Reilly Mortgage loan, the parties agreed to address plaintiff's obligation to pay for major repairs to South Pointe and other operating expenses. Defendant argues that, "[a]ny plausible 'but for' scenario must also consider the physical condition that South Pointe was in, and that major repairs over and above the routine operational costs were needed." Defendant offers a long list of needed repairs culled from a February 28, 2002 property condition report prepared by the Kennedy Group, the 2000 plans of Englewood's own architect, a March 19, 2001 letter from IHDA, and a 2001 review of the property by Mr. Samuelson. Defendant states that the dollar amount defendant quotes comes from "Englewood's own analysis, which determined that South Pointe needed $3,514,568.00 to complete repairs or replacements of the roof, the mechanical penthouse, the exterior walls, and the individual units." Defendant argues that, at a minimum, plaintiff would have been required to complete repairs to respond to code violations or requirements of other governmental authorities, such as the city of Chicago or IHDA. Using the estimates of plaintiff's architect in the record, defendant lists roof replacement, plumbing repairs, garbage chute doors, and installation of smoke detectors, for a total of $503,152.00. Defendant additionally notes, citing from the record, that elevator repair also was needed, at an estimated cost of $155,520.00. Defendant, therefore, concludes that plaintiff would have been obligated to make repairs totaling at least $658,672.00. Moreover, even if plaintiff was not obligated to make major repairs to South Pointe, defendant argues that, "[i]n any plausible 'but for' world, Englewood would have been required to maintain South Pointe in decent, safe and sanitary condition to avoid breaching the terms of its HAP contract with HUD.... Englewood would need to incur routine operating expenses, such as for utilities, management, security, eviction and other legal fees, elevator maintenance, permits, and repairs."

Plaintiff responds that it was under no obligation to pay for major repairs in the amount of $3,514,568.00 as suggested by defendant, alleging that the dollar amount originated in an August 6, 2001 letter outlining a "feasibility analysis" of HUD's proposed rehabilitation of South Pointe. Plaintiff asserts that this was "one brief phrase in one sentence in a six page memo covering 9 topics of discussion and 14 exhibits." Plaintiff further asserts that there was neither a contract, nor an obligation for Englewood to complete the approximately $3.5 million in major repairs. Plaintiff does, however, concede that it was required "to repair or replace 36% of the stoves" by the March 8, 2002 REAC report. Plaintiff also indicates that there were "chronic needs at South Pointe" that required attention, often in response to inspections conducted by REAC, IHDA, and Chicago Housing Authority, but claims "[a]ll of these were maintenance items," and distinguishes these from "capital repairs." Under the HAP contract, plaintiff argues that Englewood was only required to keep South Pointe " 'decent, safe, and sanitary,' and in compliance with REAC inspections," but plaintiff offers no evidence or documentation of what repairs were made by Englewood during the damages period.

Plaintiff argues not only that all operating expenses were paid by Englewood during the breach, but despite the fact that occupancy was declining, "[a]ll of the basic costs—gas, electricity, water, grounds, elevator, security, maintenance, janitorial services, exterminating, administration, etc.—were the same as if the building was fully occupied." Therefore, plaintiff argues that Englewood did not save any expenses from the breach. Plaintiff refers to entries in Englewood's general ledger to prove payments were made by Englewood in 2002, 2003, and 2004. Plaintiff additionally argues that it had "five sources of funding

---

17. Plaintiff references Englewood's general ledgers for the years 2002, 2003, and 2004 as evidence of its expenses. Defendant argues that "Englewood did not use these ledgers to prove it paid its expenses at trial, assuredly knowing that we would not consent to using the ledgers for this purpose because Englewood never produced underlying documents to show that expenses were in fact paid."

available to plaintiff to pay for program operations, including the increased [sic] in operating costs caused by HUD's breach. They were: (1) rental payments by residents paying market rate rents; (2) HAP payments from October 2001 through September 2002; (3) voucher payments from CHAC from October 2001 through May 25, 2004; (4) partnership contributions from October 2001 through May 25, 2004; and (5) funds borrowed by Englewood from the Illinois Housing Development Authority." Although plaintiff's general ledgers reflect as entries: "rent collection," HAP subsidies, and CHAC payments, defendant argues that the "general ledgers were used for the limited purpose of backing up its revenue figures," and that "the Government has not consented to their use to reflect payment." Defendant also argues that "Englewood did not use these ledgers to prove it paid its expenses at trial, assuredly knowing that we [defendant] would not consent to using the ledgers for this purpose because Englewood never produced underlying documents to show that expenses were in fact paid." [18] Plaintiff represents that the general ledgers entered into evidence demonstrate that Englewood paid $681,332.00 in operating expenses from July 2002 through December 2002; $1,282,043.00 in 2003; and $740,112.00 in expenses from January through September 30, 2004. Although plaintiff repeatedly states that operating expenses were paid by rental income, plaintiff acknowledges that some payments were made through advances from the Reilly Mortgage loan, specifically a gas payment of $98,500.00 on April 20, 2004 and payroll in the amount of $20,000.00 in May 2004.

For each category of expenses the parties agreed to address, the CIC loan debt service and balloon payment, the Michigan National loan, real estate taxes, insurance payments, interest and principal payments on the Reilly Mortgage loan, major repairs to South Pointe, and operating expenses, the evidence in the record establishes that various payments were made, not by Englewood, but by funds advanced by Reilly Mortgage or the IHDA. When plaintiff did make a payment,

there has been no documentation offered, other than Englewood's summary, general ledgers, which, incidentally, reflect deposits from the IHDA in addition to rental, HAP, and CHAC income, and Mr. Samuelson's broad testimony at trial. Defendant appears to be correct when it asserts that "Englewood offered, at best, inadequate evidence that it paid *any* of its obligations. This fact alone should bar the award of any damages." (emphasis in original).

As noted in a number of decisions issued by this court regarding plaintiff's case, this court affirmatively believes HUD was in the wrong when it breached the HAP contract and agrees with plaintiff that it continued to incur certain expenses. Nonetheless, plaintiff's repeated failure to keep, locate, and submit to the court adequate records has been a consistent problem throughout the above-captioned case, despite numerous opportunities accorded to plaintiff to identify and offer specific documentation, including now on remand. Even plaintiff's offered "best evidence" to prove its expenses, the general ledgers from 2002, 2003, and 2004, reflect the inadequacy of plaintiff's records. Although at trial Mr. Samuelson explained that the general ledgers were "the normal way in which we kept our records," and in the general ledgers he had "found ... the backup documentation that supported all the revenue numbers," the ledgers alone are not sufficient documentation. In its remand brief, defendant correctly asserts, "[a]s Englewood admits, its general ledgers were used for the limited purpose of backing up its revenue figures." Moreover, defendant states, "the Government has not consented to their use to reflect payment." Defendant also notes: "Englewood did not use these ledgers to prove it paid its expenses at trial, assuredly knowing that we would not consent to using the ledgers for this purpose because Englewood never produced underlying documents to show that expenses were in fact paid."

Defendant further states:

---

18. In addition to plaintiff not providing the underlying documents to the general ledgers to demonstrate any expenses, line descriptions

within the general ledgers are inconsistent, as reflected in the example included below, making it difficult to identify the various funding sources.

[N]ow five years after trial, Englewood wishes to use the general ledgers to fill the void caused by its failure to produce evidence regarding its expenses. At bottom, the general ledgers are insufficient to establish actual expenses for South Pointe because they are only a partial record of the project's full general ledger, and there was no testimony at trial explaining any entries regarding the purported expenses. They do not prove that Englewood paid the expenses cited in the Government's brief; in fact, in terms of credibility of the record itself, PX 13, PX 15 and PX 17 [the general ledgers] were generated in March 2006, years after the actual purported entries.

(internal citations omitted). Defendant is correct that the plaintiff trial exhibits for the general ledger were generated years after the transactions. All three plaintiff exhibits which contain the general ledgers contain entries from "01/01/2002 to 5/31/2004," but each is time stamped "3/10/2006 4:01 pm." Moreover, the three plaintiff trial exhibits, which contain the general ledgers, are identical in form, and each only provides limited information. All three exhibits have the same headings for the transactions:

| Description | Trans Date | Type | Refer. | Debit Amount | Credit Amount | G/L Balance | Entry No. |
| --- | --- | --- | --- | --- | --- | --- | --- |

The first page of plaintiff's trial exhibit 13, the first exhibit which contains portions of the general ledgers, is included below to demonstrate their inadequacy.

3/10/2006
4:01 pm

Englewood Terrace Limited Partnership
Ledger Detail
March 10, 2006

Page 1

01/01/2002 to 05/31/2004

1110 to 9997

| Description | Trans Date | Type | Refer. | Debit Amount | Credit Amount | G/L Balance | Entry No. |
|---|---|---|---|---|---|---|---|
| * 1110 | Petty Cash | | | | | | |
| 1100 Beginning Balance | 01/01/2002 | | | | | 300.00 | |
| Petty Cash | 02/26/2002 | APIN | PETT002 | 300.00 | | 600.00 | 00007276 |
| Petty Cash | 02/26/2002 | APIN | PETT003 | 300.00 | | 900 00 | 00007276 |
| Total for 02/2002, Acct# 1110 | | | | 600.00 | 0.00 | | |
| Net Activity for the month: | | | | 600.00 | | | |
| Establishing Petty Cash Acct. | 10/02/2002 | APIN | DAMI001 | 300.00 | | 1,200.00 | 00009789 |
| Total for 10/2002, Acct# 1110 | | | | 300.00 | 0 00 | | |
| Net Activity for the month: | | | | 300.00 | | | |
| Establishing PC Acct.For S.Boe | 11/12/2002 | APIN | PETT004 | 500.00 | | 1,700.00 | 00009965 |
| Petty Cash | 11/14/2002 | APIN | DAMI001 | 100.00 | | 1,800.00 | 00009967 |
| Petty Cash | 11/14/2002 | APIN | PETT002 | 200.00 | | 2,000.00 | 00009967 |
| Petty Cash | 11/14/2002 | APIN | ANDE001 | 100.00 | | 2,100.00 | 00009967 |
| Petty Cash | 11/15/2002 | APIN | DAMI001 | 750.00 | | 2,850.00 | 00009968 |
| Total for 11/2002, Acct# 1110 | | | | 1,6500.00 | 0.00 | | |
| Net Activity for the month: | | | | 1,6500.00 | | | |
| Petty Cash | 05/07/2003 | APIN | DAMI001 | | 100.00 | 2,750.00 | 00011174 |
| Total for 05/2003, Acct# 1110 | | | | 0.00 | 100.00 | | |
| Net Activity for the month: | | | | -100.00 | | | |
| Close S. Boyde Account | 07/25/2003 | MAN | PETTYCAS | | 672.19 | 2,077.81 | 00011768 |
| Establish Account for L. Nixon | 07/25/2003 | APIN | NIXO001 | 500.00 | | 2,577.81 | 00011793 |
| Total for 07/2003, Acct# 1110 | | | | 500.00 | 672.19 | | |
| Net Activity for the month: | | | | -172.19 | | | |
| **** 1110 Petty Cash | | | | 3,050.00 | 772.19 | 2,577.81 | |
| Net Activity on account 1110: | | | | 2,277.81 | | | |
| * 1120 | Cash – Operating Acct | | | | | | |
| 1120 Beginning Balance | 01/01/2002 | | | | | 11,997.84 | |
| Arberia Construction | 01/07/2002 | APCA | 1003 | | 1,500.00 | 10,497.84 | 00007099 |
| Lee Lumber & Building Material | 01/08/2002 | APCA | 1004 | | 340.06 | 10,157.78 | 00007100 |
| Menards | 01/11/2002 | APCA | 1006 | | 4,066.05 | 6,091.73 | 00007101 |
| Kuhl's True Value Hardware | 01/14/2002 | APCA | 1007 | | 1,294.28 | 4,797.45 | 00007102 |
| Lee Lumber & Building Material | 01/14/2002 | APCA | 1008 | | 497.57 | 4,299.88 | 00007102 |
| National Center for Housing Ma | 01/14/2002 | APCA | 1009 | | 990.00 | 3,309.88 | 00007102 |

Nowhere in the general ledgers or other evidence provided to the court is there supporting documentation for the information contained in the ledgers, nor does plaintiff cite to trial testimony which explains the general ledger entries. No more helpful are plaintiff's trial exhibits 12, 14, or 16, which appear to demonstrate the revenues from 2002, 2003 and 2004, respectively. As each of the headings for the 2002, 2003 and 2004 revenues note, however, they are: "Based on General Ledger." The court cannot rely on the information in plaintiff's trial exhibits 12, 14, or 16 as it cannot for plaintiff's trial exhibits 13, 15, or 17. Nor does the nearly 2,000 pages of documents filed as new, additional exhibits on January 31, 2013 and on February 13, 2013 following the remand, provide evidence of the expenses incurred by plaintiff as a result of the breach. The additional documents include, by way of examples: the financial requirements for closing,

the loan closing statement for South Pointe, the building loan agreement, the October 29, 2002 payoff letter from Englewood to Standard Federal Bank, N.A., the December 6, 2002 Englewood Commitment Letter, the December 12, 2002 mortgage between Chicago Title and Trust Co. and Reilly Mortgage, the December 11, 2002 Owner–Architect Agreement between Englewood and T.D. Dunaj, the initial January 17, 2003, operating deficit disbursement approved by HUD, the February 10, 2003 Construction Loan Escrow Disbursing Agreement, the approved Advance of Escrow Funds from Reilly Mortgage to Englewood, the property liability insurance that Englewood did not pay in December 2003, Englewood's Applications for Insurance of Advance of Mortgage Proceeds, documents related to Reilly Mortgage's Foreclosure action in the Cook County, Illinois Court, Englewood's Breach of Contract complaint and cross-claim against Reilly Mortgage in the Cook County, Illinois Court, and duplicative copies of a number of the documents listed above. The submitted documents do not support plaintiff's claims for lost profits, as the documents fail to reveal any payments affirmatively made by plaintiff, but just offer further evidence that payments were made out of funds advanced by Reilly Mortgage or the Illinois Housing Department Authority.

In order to be awarded lost profits based on avoided costs and expenses, the plaintiff must demonstrate the avoided costs and expenses with reasonable certainty. *See S. Nuclear Operating Co. v. United States,* 637 F.3d at 1304; *see also Bluebonnet Sav. Bank F.S.B. v. United States,* 67 Fed.Cl. at 238 ("[B]ecause plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for' world."). Plaintiff retains this burden as it is the party incurring the costs, and, therefore, "is in the best position to adduce and establish such proof." *S. Nuclear Operating Co. v. United States,* 637 F.3d at 1304 (internal quotation omitted). Plaintiff, however, has not offered such proof throughout the proceedings before this court, as its records are inadequate and unsupported. Despite the repeated offers, and even instructions by the court, for the parties to review and, if necessary, supplement the record, including instructing the defendant to file additional documentation after the remand, the plaintiff has not been able to demonstrate in the record avoided costs and expenses with reasonable certainty. The court agrees with the defendant that "Englewood offered, at best, inadequate evidence that it paid *any* of its obligations. This fact alone should bar the award of any damages." (emphasis in original). Plaintiff's general assertions that the mortgage proceeds directly and indirectly paid Englewood's expenses and, therefore, Englewood is entitled to recover for making these payments does not justify an award to plaintiff.

In reviewing the record as a whole, this court, cannot determine which, if any, were costs not avoided by the breach. The record is replete with documents demonstrating payments made, as a result of funds advanced by Reilly Mortgage or the Illinois Housing Department Authority, but not by plaintiff. In furnishing incomplete records of its own payments, the plaintiff has placed itself in a position to receive no award at all. The documents produced at trial and the numerous documents submitted on remand do not meet plaintiff's burden. As noted repeatedly, throughout the many opinions issued in this case, defendant, indeed, breached the HAP contract. Plaintiff, however, has failed to provide necessary evidence to prove its damages as a result of that breach. Therefore, the original damages award in *Englewood V,* 94 Fed.Cl. 116, of $3,272,217.00 is reduced to zero. As plaintiff has failed to meet its obligation to offer evidence to demonstrate entitlement to damages, in accordance with the instructions of the Federal Circuit to review the proof and, if necessary, reduce the damages award, the court does not reach the issue of whether, or to what extent, plaintiff was obligated to make repairs to South Pointe or the costs of maintenance to ensure South Pointe remained in compliance of the HAP contract, or the routine operating expenses.

## CONCLUSION

Throughout the case, during pre-trial, trial and post-trial proceedings, and even after the

remand, plaintiff has struggled and has been unable to produce adequate and coherent records to support the claims filed in this court. Although the court recognizes that HUD breached the contract with plaintiff, and that there was a difficult history between the parties, both before and during the proceedings of the case, in light of the United States Court of Appeals for the Federal Circuit's instructions on remand, the HAP contract damages of $3,272,217.00, previously awarded to plaintiff by this court to account for breach damages, are reduced to zero.

IT IS SO ORDERED.