NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ENGLEWOOD TERRACE LIMITED PARTNERSHIP,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Cross Appellant.*

---

2011-5072, -5073

---

Appeal from the United States Court of Federal Claims in case no. 03-CV-2209, Judge Marian Blank Horn.

---

Decided: May 2, 2012

---

BRIAN J. MURRAY, Jones Day, of Chicago, Illinois, argued for plaintiff-appellant. On the brief was DON S. SAMUELSON, Law Offices of Don S. Samuelson, of Lake Forest, Illinois.

CHRISTOPHER A. BOWEN, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-

cross appellant. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and BRIAN M. SIMKIN, Assistant Director. Of counsel was DOUGLAS K. MICKLE, Senior Trial Counsel. Of counsel on the brief were GREGORY G. GUSTIN, MARIA T. BAGUIO, LORRAINE C. SHOTO and JARET R. FISHMAN, Department of Housing and Urban Development, of Washington, DC.

_____

Before LOURIE, DYK, and MOORE, *Circuit Judges*.

DYK, *Circuit Judge*.

Englewood Terrace Limited Partnership ("Englewood") and the United States Department of Housing and Urban Development ("HUD") entered into a housing assistance payment ("HAP") contract. The United States Court of Federal Claims ("Claims Court") held that HUD breached the contract, *Englewood Terrace Ltd. P'ship v. United States* ("*Englewood II*"), 79 Fed. Cl. 516 (2007), and awarded damages, *Englewood Terrace Ltd. P'ship v. United States* ("*Englewood V*"), 94 Fed. Cl. 116 (2010). Englewood appeals, contending that it was entitled to a larger damages award. HUD cross-appeals, contending that the Claims Court erred in concluding that it breached the HAP contract, and also erred in its damages award. We *affirm in part*, *reverse in part*, and *remand*.

BACKGROUND

Englewood owned South Pointe, a 303-unit apartment building in Chicago, Illinois. In 1998, Englewood entered into a HAP contract with HUD to receive housing assistance payments on behalf of its low-income tenants. In order to receive these subsidies, paragraph 6(a) of the contract required Englewood "to provide decent, safe, and sanitary housing including the provision of all the ser-

vices, maintenance and utilities." *Englewood II*, 79 Fed. Cl. at 518. The contract also provided that "[i]f HUD notifies the Owner that it has failed to maintain a dwelling unit in decent, safe, and sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice," HUD may take action under the default clause of the contract.[1] *Id.*

On October 16, 2000, Englewood and HUD renewed the HAP contract for a one-year term with three automatic one-year renewal terms. The term of the contract began on October 1, 2000, and was thus set to expire on September 30, 2004. The 2000 HAP contract renewed all terms of the previous contracts, with the exception of provisions relating to contract rents and rent adjustments. An addendum to the 2000 HAP contract further provided that

> in the event HUD's Real Estate Assessment Center (REAC) issues a physical inspection report to

---

[1]    The contract also provided that

HUD shall inspect or cause to be inspected at such times as may be necessary to ensure that the Owner is meeting its obligation to maintain the units in decent, safe, and sanitary condition . . . .

*Id.* If an owner was in default, HUD was required to notify the property owner of

(i) The nature of the default,
(ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default), and
(iii) The time within which the Owner shall respond with a showing that all the required actions have been taken.

*Id.* at 519.

the Owner that has a score which evidences Owner failure to comply with HUD's Uniform Physical Condition Standards and Physical Inspection Requirement, . . . HUD may terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies . . . .

*Id.* at 519.

On March 2, 2001, REAC conducted an inspection of 25 of the 303 units at Englewood's South Pointe property. That same day, REAC provided Englewood an initial report listing a number of exigent health and safety deficiencies discovered during the inspection. This report informed Englewood that it was required to correct all such deficiencies within 72 hours of the inspection. On March 6, Englewood certified to HUD that all exigent health and safety deficiencies had been corrected on March 2 and 3. On March 8, REAC issued a full physical inspection report which indicated that South Pointe received a failing score. This report identified a number of other deficiencies, in addition to the exigent health and safety violations, in the physical condition of the property. The report stated that Englewood had 30 days to conduct its own survey of the property to identify additional deficiencies and to submit a Proposed Plan of Correction for the deficiencies identified both by REAC and by its own survey. The plan was to list the deficiencies Englewood already corrected, the resources available to correct the remaining deficiencies, and completion timeframe for the remaining work. Englewood subsequently submitted on April 5, within 30 days of the March 8 report, a Proposed Plan of Correction to HUD stating the actions already taken to correct any deficiencies, proposing a plan of correction for the remaining items, and identifying the source of funding for the proposed corrections.

On April 9, HUD issued a notice of default. The notice indicated that HUD had concluded that not all of the exigent health and safety deficiencies identified in the REAC report had been corrected. Furthermore, the notice stated that South Pointe "suffers from ongoing serious neglect, disrepair, and unsafe and unsanitary conditions." Englewood was notified that "if the foregoing events of default are not corrected to the satisfaction of HUD within 30 days from the date of this Notice, HUD may seek any and all available remedies; including, without limitation, suspending or abating the HAP contract." J.A. 291. On May 16, HUD issued a Notice of Continuing Default to Englewood, reiterating the basis in the April 9 Notice.

On October 1, HUD e-mailed Englewood to inform it that tenant-based vouchers were being issued to the South Pointe residents as of that date, and that the HAP contract would be terminated once all residents received their vouchers. Tenant-based vouchers are subsidies paid by HUD on behalf of tenants that can be used at a different housing project if a particular tenant desires to relocate. On November 30, HUD sent Englewood a Notice of Abatement and Termination of the HAP contract, which stated that "[t]o date, Owner has not cured the conditions complained of in the notice of default issued on April 9, 2001 and as more fully described in HUD's May 16, 2001 writing." J.A. 327. The termination notice again stated that "[t]he HAP Contract will be terminated when HUD has . . . completed its voucher and relocation process for all eligible residents at [South Pointe]." J.A. 328. The HAP contract with Englewood was ultimately terminated on September 30, 2002.

On September 22, 2003, Englewood filed a breach-of-contract action against HUD seeking damages for HUD's alleged breach of the 2000 HAP contract. HUD defended

on the ground that Englewood had defaulted on the contract through its failure to maintain South Pointe in a decent, safe, and sanitary condition. The Claims Court rejected this argument and found that HUD "breached the 2000 HAP contract, and was not justified in doing so by the claimed default on the part of Englewood." *Englewood II*, 79 Fed. Cl. at 551. The court found, and HUD agrees, that HUD could not terminate the contract without providing notice of a deficiency and giving Englewood the opportunity to cure. The court found, and again HUD agrees, that the only notice of deficiencies was contained in the March 8, 2001, REAC inspection report. *Id.* at 540. The court found that all of the exigent health and safety violations had been remedied within the required 72 hours, *id.* at 540-41, and that most of the other deficiencies noted in the March 8 report had been corrected within 30 days of the report, as reflected in Englewood's Proposed Plan of Correction, *id.* at 542. Furthermore, all of the remaining items were in the process of being corrected and had reasonable estimated completion dates, and Englewood had identified an internal source of funding to correct these deficiencies. *Id.* at 542-43. Thus, the court concluded that HUD breached the contract because it "did not afford Englewood a fair and meaningful opportunity to respond to the March, 2001 REAC-identified deficiencies." *Id.* at 542.

After further briefing, the Claims Court awarded Englewood $3,272,217 in lost profits. *Englewood V*, 94 Fed. Cl. at 134. The court determined that Englewood's lost profits were reasonably foreseeable and caused by HUD's breach, *id.* at 123-25, and set July 1, 2002, as the date of the breach for purposes of calculating damages because that date was the date by which the voucher process was complete and had a substantial effect on the occupancy at Englewood, *id.* at 127. The court also found

that, because a HUD-insured loan to Englewood would require renovations on at least two floors of South Pointe at a time, it would assume a 9.5% vacancy rate for most of the breach period, *id.* at 128, and that Englewood had not shown any entitlement to rent increases, *id.* at 126.

The court awarded Englewood's lost profits based on the difference between the rent it was actually receiving and the rent it would have received if HUD had not breached the contract without deducting expenses that Englewood would have incurred absent breach. See *id.* Finally, the court concluded that Englewood's claim for lost equity damages (the asserted decline in value of the property as a result of the breach) was "far too remote and speculative to allow recovery," *id.* at 132, finding that Englewood was unable to prove that lost equity damages were foreseeable; that the damages were caused by the breach; or that they were established with reasonable certainty, *id.* at 132-34. Englewood timely appealed, and HUD cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review the Claims Court's findings of fact under the clearly erroneous standard, while we review its legal holdings de novo. *Bell BCI Co. v. United States*, 570 F.3d 1337, 1340 (Fed. Cir. 2009).

We see no error in the Claims Court's determination that HUD breached the 2000 HAP contract; that July 1, 2002, was an appropriate start of the damages period; that a 9.5% vacancy rate was appropriately used in the calculation of damages; that Englewood had not shown its entitlement to rent increases; that Englewood was not entitled to lost equity damages; and that Englewood was entitled to lost profits as a result of HUD's breach (if there

were any lost profits). However, we find that the Claims Court erred in calculating lost profits.

The Claims Court awarded Englewood all of the gross revenue it would have received had HUD not breached the HAP contract without concurrently subtracting various costs or expenses that Englewood would have incurred absent breach. The Claims Court calculated Englewood's lost profits by simply subtracting the rent revenue received by Englewood during the breach period from the total potential revenue it could have received during the same period if the contract had not been breached. *See Englewood V*, 94 Fed. Cl. at 126. HUD identified numerous costs saved by Englewood that it urged should have offset the lost profits damages received by Englewood. HUD asserts that if it had not breached the contract, Englewood would have had to repay the HUD-insured and IHDA loans that it took out in December 2002, along with the property taxes and liability insurance for South Pointe, which HUD argues Englewood did not pay during the breach period in 2003 and 2004. Moreover, HUD argues that had the contract not been breached, Englewood would also have been required to pay South Pointe's operating expenses and to expend money making repairs to South Pointe to maintain its compliance with HUD standards. The Claims Court made no findings as to the amount of costs saved by Englewood, but simply held that there was no need to deduct such costs from Englewood's rent revenue.

The Claims Court erred by failing to deduct costs and expenses Englewood saved, i.e., did not pay, as a result of the breach. An award of gross revenues is not appropriate; this is not the measure of Englewood's loss from HUD's breach. By failing to deduct avoided costs, the Claims Court placed Englewood in a better position than it would have been in had there been no breach. *See*

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003).

As a matter of general contract law, an injured party can collect as expectancy damages, i.e., lost profits, "the loss in value to him of the other party's performance caused by its failure or deficiency, . . . less . . . any cost or other loss that he has avoided by not having to perform." *Restatement (Second) of Contracts* § 347 (1981); *see also Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328, 1344 (Fed. Cir. 2003) (Dyk, J., dissenting in part) (quoting *Restatement (First) of Contracts* § 329 cmt. a (1932) ("[C]ompensatory damages will be given for the net amount of the losses caused and gains prevented, in excess of savings made possible.")). We have consistently applied these principles in other breach of government contract cases. *See, e.g.*, *Slattery v. United States*, 583 F.3d 800, 817-18 (Fed. Cir. 2009); *Bluebonnet Sav. Bank*, 339 F.3d at 1345.

Even the Claims Court recognized that in setting a damages award "the costs resulting from the breach must be reduced by any costs that the plaintiff would have incurred absent the breach." *Englewood V*, 94 Fed. Cl. at 122. But the court did not follow its own statement of the law, declining to deduct expenses from the lost rental revenue because "in its HAP contract damages claim Englewood is not asking the government to reimburse it for costs it incurred due to the breach, it is only asking for the HAP revenue it lost." *Id.* at 128. There is no support for this approach in a breach-of-contract case of this kind, and it is incorrect. It is well established that where a plaintiff saved certain expenses as the result of the breach of a contract, lost revenue alone is not an appropriate measure of damages. *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 647 (7th Cir. 2011) ("[G]ross revenue is generally not an appropriate measure of damages

because revenue is calculated without regard to the costs the plaintiff incurred in the course of making that revenue."); *see also Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 208 (5th Cir. 2000); *Sure-Trip, Inc. v. Westinghouse Eng'g*, 47 F.3d 526, 532 (2d Cir. 1995); *Taylor v. Meirick*, 712 F.2d 1112, 1121 (7th Cir. 1983).

The Claims Court's justification for its approach appears to be that because the expenses Englewood expended due to the breach may have been greater than those it would have incurred absent the breach, the award of contract damages did "not place [Englewood] in a better position than it would have been without the breach." *Englewood V*, 94 Fed. Cl. at 128. There is, however, no identification or support for such expenses Englewood supposedly expended due to the breach in either the Claims Court's opinion or in Englewood's briefs before this court. The fact that Englewood may have failed to assert a claim for additional damages is no justification for using an erroneous lost profits calculation.

A remand is necessary for the Claims Court to determine an appropriate reduction in the award to the plaintiff (a reduction that could entirely eliminate the lost profits award). The Claims Court must reduce the award by any operational costs or expenses Englewood did not pay but would have been obligated to pay if HUD had not breached the HAP contract.[2] These may include mortgage payments, liability insurance, property taxes, and money for repairs and rehabilitation of South Pointe. We make no determination as to which of these items should

---

[2]    As HUD concedes, if Englewood retained legal obligations to repay these expenses they would not need to be deducted. *See* Cross Appellant's Reply Br. 19. But HUD contends that it already largely paid these costs itself.

be deducted, leaving that determination to the Claims Court in the first instance.

Thus, with respect to Englewood's appeal we affirm. With respect to HUD's cross-appeal we affirm, except that we reverse and remand to the Claims Court for recalculation of lost profits damages.