# United States Court of Appeals for the Federal Circuit

_____

**NORMANDY APARTMENTS, LIMITED,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2014-5135

_____

Appeal from the United States Court of Federal Claims in No. 1:10-cv-00051-EGB, Senior Judge Eric G. Bruggink.

_____

Decided: November 20, 2015

_____

TERRY MICHAEL MCKEEVER, Foshee & Yaffe, Oklahoma City, OK, argued for plaintiff-appellant.

AMANDA TANTUM, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOYCE R. BRANDA, ROBERT E. KIRSCHMAN, JR., KIRK T. MANHARDT; PATRICIA SHARIN FLAGG, Office of General Counsel, United States Department of Housing and Urban Development, Washington, DC.

_____

Before NEWMAN, REYNA, and WALLACH, *Circuit Judges.*

Opinion for the court filed by WALLACH, *Circuit Judge.*

Additional views filed by REYNA, *Circuit Judge,* with whom WALLACH, *Circuit Judge*, joins.

Dissenting opinion filed by NEWMAN, *Circuit Judge.*

WALLACH, *Circuit Judge.*

Normandy Apartments, Ltd. ("Normandy") appeals the United States Court of Federal Claims' orders granting the government's: (1) motion to dismiss for lack of jurisdiction; and (2) motion for summary judgment on Normandy's takings claim. *Normandy Apartments, Ltd. v. United States*, 116 Fed. Cl. 431 (2014); *see also Normandy Apartments, Ltd. v. United States*, 100 Fed. Cl. 247 (2011). For the reasons set forth below, this court affirms.

BACKGROUND

I. Facts

Normandy owned and managed Normandy Apartments, a low-income rental housing project constructed in 1968 in Tulsa, Oklahoma. Tenants' rents at Normandy Apartments were federally subsidized under the Section 8 project-based program, *see* 42 U.S.C. § 1437f, which was created "to 'ai[d] low-income families in obtaining a decent place to live . . . by subsidizing private landlords who would rent to low-income tenants.'" *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 12 (1993) (alteration in original) (quoting 42 U.S.C. § 1437f(a)). In this system, a monthly rent is set for each apartment, the tenants pay a portion of that rent based on their ability to pay, and the United States Department of Housing and Urban Development ("HUD") pays the difference between each tenant's contribution and the allowable rent for the unit. 42 U.S.C. § 1437f(c)(3).

Effective October 1, 1992, Normandy and the United States, acting through HUD, entered into a Section 8 rental subsidy agreement called a Housing Assistance Payments ("HAP") contract (the "Original HAP Contract"). Pursuant to this contract, HUD agreed to pay the difference between the tenant's contribution and the rent, and Normandy agreed it would "'maintain and operate the contract units and related facilities so as to provide decent, safe, and sanitary housing as defined by HUD,' to clean and 'make repairs with reasonable promptness,' to 'respond promptly to HUD's Physical Inspection Reports and to implement corrective actions within a reasonable time.'" *Normandy*, 116 Fed. Cl. at 434 (quoting Original HAP Contract). HUD enforces these requirements through inspections, audits, and other actions, including withholding assistance payments. 42 U.S.C. § 1437c(h); 24 C.F.R. § 886.123. HUD's Real Estate Assessment Center ("REAC") inspects Section 8 housing and assigns a score on a 100-point scale. 24 C.F.R. §§ 5.705, 200.857 (2014).

In 1997, the Original HAP Contract expired, and Normandy and HUD renewed the contract annually until 2004. On October 1, 2004, when the prior year's HAP contract had expired, Normandy entered into the next renewal contract ("2004 HAP Contract")—the basis for Normandy's breach of contract claims. Though the earlier HAP contracts had been made with HUD, in the 2004 HAP Contract, the Oklahoma Housing Finance Authority ("OHFA"), a public housing agency ("PHA"), was identified as the "contract administrator." *Normandy*, 116 Fed. Cl. at 434. While HUD was no longer a party to the contract, the rest of the contract terms in the Original HAP Contract were renewed, including the provision that Normandy "maintain and operate the contract units and related facilities so as to provide decent, safe, and sanitary housing as defined by HUD." *Id.*

On May 23, 2000, Normandy entered into a separate "Use Agreement" with HUD, which "allowed Normandy to prepay its HUD-backed mortgage and terminate the 1967 Regulatory Agreement between it and HUD." *Id.*; *see also id.* at 435 ("The Use Agreement is independent of the HAP contract, although the former contemplates the possibility that a HAP contract may cover some or all of the units."). Under the Use Agreement, Normandy pre-paid its HUD-insured mortgage, and, in exchange, Normandy agreed to continue housing low-income families until June 1, 2009, the original maturity date of the mortgage. Pursuant to the Use Agreement, Normandy's use of the apartment complex was restricted to "rental housing for tenants of lower income," Normandy agreed not to evict existing tenants based on income, J.A. 148, Normandy was required to maintain the apartment complex "in a condition that is decent, safe, sanitary, and in good repair, as well as in compliance with all applicable state and local building and health codes," J.A. 151, and Normandy was required to obtain HUD's approval before conveying the property.

Pursuant to the 2004 HAP Contract, in November 2004, REAC "inspected the Normandy Apartments to verify the units were safe, decent, and sanitary." *Normandy*, 116 Fed. Cl. at 435. The apartments received a failing score. Normandy corrected the identified problems and, when OHFA conducted an inspection in February 2005, it noted the previous deficiencies had been fixed. HUD itself did not reinspect the apartments, but notified Normandy in February 2006 that it was closing the November 2004 inspection.

Under 24 C.F.R. §§ 200.855(c)(l), 886.323 (2014), HUD is required to inspect a property between nine and fifteen months from the date of the prior inspection. Here, the next REAC inspection did not occur until August 23, 2006, more than twenty months after the November 2004 inspection. Normandy failed this inspection, but subse-

quently requested that HUD adjust the score "because the apartment complex was undergoing repairs; specifically, all of the windows were being replaced." *Normandy*, 116 Fed. Cl. at 435. On October 15, 2006, Normandy inquired with HUD about the status of its appeal regarding its failing score. In November, HUD replied and notified Normandy that it had missed the deadline to appeal the score.

In March 2007, HUD requested that Normandy write a letter certifying that it was in compliance with the inspection requirements. Because the window replacement was ongoing, Normandy was not able to certify its compliance and instead provided a letter from its window contractor stating the anticipated completion date for the repairs. HUD then informed Normandy that it would perform a reinspection, but never did so. Instead, it sent a June 20, 2007, letter notifying Normandy that HUD "would cease to fund housing assistance payments because [Normandy] had defaulted on the HAP [C]ontract by repeatedly failing to maintain the apartments." *Id.*

Specifically, on September 28, 2007, HUD warned Normandy that its assistance payments would be terminated and that Normandy should stop accepting new low-income qualified tenants. HUD also notified Normandy that any affected tenants could apply for vouchers to offset their rent at the Normandy Apartments or enable them to move elsewhere. Shortly before November 1, 2007, HUD informed Normandy that it was obligated to continue honoring the below-market rental rates during the existing lease terms.

Normandy attempted to sell the apartment complex before the HUD payments stopped. Normandy alleges that on October 16, 2007, Summit Assets Management, L.L.C. ("Summit") agreed to purchase the Normandy Apartments for $8 million. Pursuant to the Use Agreement, Normandy sought HUD's approval of the sale, but,

according to Normandy, HUD withheld its approval and Summit did not purchase the apartments. "Normandy claims a loss of approximately $2.75 million because the apartments subsequently decreased in value and, as of 2009, were appraised at $5.25 million." *Id.* at 436.

## II. Proceedings

On October 18, 2007, Normandy filed a lawsuit in the United States District Court for the Western District of Oklahoma, requesting, in relevant part, a preliminary injunction ordering HUD to continue making housing assistance payments pending the litigation. *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.*, No. CIV-07-1161-R, 2007 U.S. Dist. LEXIS 81330, at *1 (W.D. Okla. Nov. 1, 2007). The court concluded it lacked jurisdiction because Normandy's claim fell under the Tucker Act and therefore belonged in the United States Court of Federal Claims. The court nevertheless addressed the merits of the preliminary injunction, and found Normandy was unable to satisfy the necessary irreparable harm element to obtain the injunction.

Normandy appealed the district court's decision to the United States Court of Appeals for the Tenth Circuit. *See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 1290 (10th Cir. 2009). The Tenth Circuit affirmed-in-part and reversed-in-part, holding "when a party asserts that the government's breach of contract is contrary to federal regulations, statutes, or the Constitution, and when the party seeks relief other than money damages, the [Administrative Procedure Act's ("APA")] waiver of sovereign immunity applies and the Tucker Act does not preclude a federal district court from taking jurisdiction." *Id.* at 1300.

Normandy did not pursue its APA claims and instead, on January 25, 2010, brought suit in the United States Court of Federal Claims ("Claims Court"). Normandy's first Complaint asserted a breach of the 2004 HAP Con-

tract and requested approximately $3.5 million in damages. The government moved to dismiss the case for lack of subject matter jurisdiction on the grounds that the United States was not a party to the 2004 HAP Contract. The Claims Court agreed, finding that without a contract between Normandy and the United States, it lacked jurisdiction. *Normandy*, 100 Fed. Cl. at 256–58.

In an amended Complaint, Normandy alleged "that HUD's actions interfered with [its] property interests in the apartment complex, the Use Agreement, the [2004] HAP [C]ontract, and its purchase agreement with Summit." *Normandy*, 116 Fed. Cl. at 437. The government filed a motion to dismiss the takings claim. The Claims Court converted the motion into a summary judgment motion and granted that motion. It also reaffirmed its dismissal for lack of jurisdiction regarding Normandy's contract claim.

Normandy appeals; this court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2012).

DISCUSSION

I. Standard of Review

"We review the Court of Federal Claims' grant of summary judgment under a *de novo* standard of review, with justifiable factual inferences being drawn in favor of the party opposing summary judgment." *Winstar Corp. v. United States*, 64 F.3d 1531, 1539 (Fed. Cir. 1995), *aff'd and remanded*, 518 U.S. 839 (1996). A motion for summary judgment is properly granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The existence or nonexistence of a contract is a mixed question of law and fact; contract interpretation is a question of law, reviewed de novo." *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328 (Fed. Cir. 2005).

## II. The Claims Court Correctly Dismissed Normandy's Breach of Contract Claim for Lack of Jurisdiction

### A. The United States Is Not a Party to the 2004 HAP Contract

The United States "is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). "To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract." *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990). In other words, privity of contract is a "prerequisite for standing to sue in the Court of Federal Claims under the Tucker Act." *Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1435 (Fed. Cir. 1997).

The Claims Court held that "[t]he conclusion is inescapable: HUD and Normandy had no contractual relationship in the 2004 HAP [Contract]. [Normandy] is unable to enforce its rights in that [C]ontract against the federal government because the United States was not a party to it." *Normandy*, 116 Fed. Cl. at 443.

The named parties and the signatories of the 2004 HAP Contract are OHFA and Normandy. J.A. 82 (naming, in a section titled "Parties to Renewal Contract," OHFA as the "Contract Administrator" and Normandy Apartment Limited as the "Name of Owner"). HUD is neither a named party nor a signatory to the 2004 HAP Contract. Section 4a(1) of the 2004 HAP Contract states: "The Renewal Contract is a housing assistance payments contract . . . between the Contract Administrator and the Owner of the Project." J.A. 84. Additionally, where the [C]ontract requires "Signatures" on its last page, the

signing party under the line "Contract administrator (HUD or PHA)" is solely OHFA. J.A. 92. Normandy is the only other signatory that appears on the contract. J.A. 92; *see also* 24 C.F.R. §§ 880.201, 881.201 (noting, in the definition of "Contract," that the HAP Contract is "entered into by the owner and the contract administrator," and defining "Contract Administrator" as "[t]he entity which enters into the Contract with the owner"). Thus, by its plain language, the United States was not a party to the 2004 HAP Contract.

Nonetheless, Normandy insists "HUD was a party in privity to the 2004 [HAP Contract]" and relies on *Englewood Terrace Limited Partnership v. United States*, 79 Fed. Cl. 516, 534 (2007), *aff'd in part and rev'd on other grounds*, 479 F. App'x 969 (Fed. Cir. 2012) (unpublished), to argue that the Claims Court "should have drawn from the reasoning" of that decision. Appellant's Br. 19–20.

In that case, HUD attempted to modify a HAP agreement by "substitut[ing] the short-term contracts for what was reasonably anticipated to be a four-year contract" to incentivize the property owner to improve its performance under the HAP Contract. *Englewood*, 79 Fed. Cl. at 534. Explaining "that a subsequent agreement *between* the parties could supercede [sic] a term in an earlier agreement by the same parties, if that was the *mutual intent* of the parties," the *Englewood* court found "[b]ased on the record, [the] substitution was a unilateral act, on the part of HUD, imposed on Englewood." *Id.* The court reasoned "[i]t is not logical, or based on the record, to conclude that Englewood . . . was a willing participant in converting its anticipated four-year contract into uncertain, short-term contracts of varying length." *Id.*

According to Normandy, "[t]he facts in this case can be plugged directly into the *Englewood* analysis. In order for the HUD to modify the prior Use Agreement and HAP[] Agreements in a manner that would revoke its

contract privity with Normandy, *both* parties must *mutually assent*." Appellant's Br. 21. Furthermore, Normandy argues that "[b]y signing the 2004 HAP Renewal Agreement, Normandy had absolutely no intention of sacrificing its ability to recover against the HUD in the event HUD breached its prior agreements with Normandy." *Id.*

As an initial matter, Normandy did not make this argument before the Claims Court and it is therefore waived. *Gant v. United States*, 417 F.3d 1328, 1332 (Fed. Cir. 2005) ("Arguments not made in the court or tribunal whose order is under review are normally considered waived."). In any event, *Englewood* is inapposite and is not binding on this court. Here, the Original HAP Contract was between Normandy and HUD, with HUD noted as the contract administrator, while the 2004 HAP Contract was between Normandy and OHFA, with OHFA noted as the contract administrator. By contrast, *Englewood* dealt with "a subsequent agreement *between* the parties" and "an earlier agreement *by the same* parties." *Englewood*, 79 Fed. Cl. at 534 (second emphasis added). Thus, the *Englewood* court had no need to address the question of privity, and its reasoning does not apply to the instant case.

Normandy also argues that "[t]he purpose of the [2004] HAP [] Contract was to renew the expiring terms of the [O]riginal HAP [C]ontract except for those terms specifically modified by the Renewal Contract," and "[i]n essence, the HUD remained a party to the provisions of the HAP Renewal Contract that pertained to HUD's role, and this would include any renewed provisions." Appellant's Br. 22–23. The 2004 HAP Contract did specifically modify the earlier contract, however, in that OHFA was named the contract administrator, and HUD was not. *See Senate Manor Props., LLC v. U.S. Dep't of Hous. & Urban Dev.*, 315 F. App'x 235, 237–38 (Fed. Cir. 2008) (unpublished) (explaining HUD was not in privity because "section 4a of the 2005 HAP [R]enewal [C]ontract stated

that terms of the expiring HAP [C]ontract were renewed '[e]xcept as specifically modified by the Renewal Contract'" (fourth alteration in original)).

Normandy also argues "HUD stepped in[to] the shoes of OHFA, giving itself privity" with respect to the 2004 HAP Contract. Appellant's Br. 26. However, that HUD provided funding, oversight, and enforcement does not make HUD a party under the contract. In *Katz v. Cisneros*, this court held that "a grant of benefits and subsequent oversight by HUD is insufficient to establish a contractual obligation between [a property developer] and the government." 16 F.3d 1204, 1209–10 (Fed. Cir. 1994). "'This is true even if the local agency is acting merely as a conduit for the federal funds.'" *Id.* (quoting *Marshall N. Dana Constr., Inc. v. United States*, 229 Ct. Cl. 862 (1982)); *see also Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1436 (Fed. Cir. 1997) (plaintiffs arguing that the United States was in privity of contract because "the PHAs acted as 'agents' for the United States," and this court finding the United States was not in privity of contract). Accordingly, Normandy fails to show HUD was in privity of contract.

## B. HUD Did Not Have an Implied-in-Fact Contract with Normandy

Normandy alternatively argues that "[e]ven if this court finds that the HUD was not a party in privity to the 2004 HAP [Contract], HUD had privity with Normandy through an implied-in-fact contract." Appellant's Br. 29. "An implied-in-fact contract is one 'founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (quoting *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)). "It is well settled that the existence of an

express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002). Because the 2004 HAP Contract and Use Agreement contain requirements related to decent, safe, and sanitary conditions and the 2004 HAP Contract contained the requirements related to HAP payments, the existence of an implied-in-fact contract regarding the same requirements is precluded.

## C. The Claims Court Correctly Found that HUD Did Not Breach the 2000 Use Agreement

On May 23, 2000, Normandy entered into a separate "Use Agreement" with HUD, which allowed Normandy to prepay its HUD-backed mortgage and terminate a previous Regulatory Agreement between it and HUD. Normandy contends that HUD "breached its obligations under the 2000 Use Agreement" because "HUD's conduct at issue took place within [the Use Agreement] time period" and the "[Use] [A]greement incorporates any applicable HAP contract." Appellant's Br. 17. The Claims Court found there was "not the slightest hint that the parties to the Use Agreement intended to incorporate therein the provisions of current and future HAP contracts dealing with the payment of rent subsidies." J.A. 466–67. Normandy points to the Use Agreement's reference to § 221(d)(3) of the National Housing Act, now 12 U.S.C. § 1715*l*, to argue that HUD was required to provide subsidies to property owners through HAP contracts. Normandy asserts that 12 U.S.C. § 1715(d)(3) is an "express part of the Use Agreement." Appellant's Br. 19.

The reference to § 221(d)(3) Normandy relies on is in the section of the Use Agreement reciting facts, and is referenced in order to note that Normandy had "covenanted that, in the event the Regulatory Agreement terminated by prepayment, in full, . . . [Normandy] would continue

to operate the Normandy Apartments project (as defined therein) in accordance with Section 221(d)(3) of the NHA, or any successor legislation, until the Maturity Date." J.A. 145. The other reference to § 221(d)(3) pertains to the insurance of the loan secured by the mortgage of the Normandy Apartments, and is not relevant here.

"[T]he incorporating contract must use language that is *express* and *clear*, so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract." *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008). Furthermore, "[t]his court has been reluctant to find that statutory or regulatory provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation." *St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008). Here, the reference to § 221(d)(3) is reciting facts and, even if it were expressly part of the contract as Normandy claims, it does not unambiguously incorporate the 2004 HAP Contract.

Normandy insists that "[e]ven if such language does not incorporate all of into [sic] the contract the parties' statutory obligations under the statute, there still remains a genuine issue of material fact as to whether the HUD breached the Use Agreement." Appellant's Br. 18. Normandy misunderstands the decision below: the Claims Court did not grant summary judgment in favor of the government; it dismissed for lack of jurisdiction because HUD was not in privity of contract. *See Normandy*, 116 Fed. Cl. at 443 ("Defendant has maintained and we previously held that plaintiff was not in privity with HUD and thus could not sue to enforce the [2004] HAP [] [C]ontract in this court. . . . We reach the same conclusion again." (citation omitted)). Accordingly, because the reference to § 221(d)(3) does not make HUD in privity of contract, we

affirm the Claims Court's dismissal for lack of jurisdiction over the breach of contract claim.

## III. HUD's Conduct Did Not Constitute a Regulatory Taking

The Claims Court found HUD's conduct was not a taking because "[Normandy's] right to receive the housing assistance payments was controlled by the HAP [R]enewal [C]ontract with OHFA. Those payments were conditioned, however, on performance to the satisfaction of a third party, HUD." *Id.* at 442. The court further explained that though Normandy "may disagree with how HUD handled the administrative procedures involved in weighing the performance and the conclusion that HUD reached, [] there is no question that the right to receive those payments was limited by contract, and, indirectly, by the regulatory regime incorporated into that contract." *Id.* "The result," the court stated, "is that HUD was not 'taking' a property interest when it exercised its regulatory role of monitoring the condition of the building. [Normandy] did not, by contract, have the right to those payments free of potential HUD oversight. It had contracted away that right." *Id.*

On appeal, Normandy's primary argument is that it "had an investment-backed expectation to collect minimum rents set forth under the 2000 Use Agreement and applicable HAP contract unless Congress failed to appropriate funds or HUD exercised its regulatory and contractual remedy to abate or terminate HAP payments after complying with the applicable contracts and HUD regulations." Appellant's Br. 15. Normandy also contends that it "received minimal rent from the tenant-based voucher program. And some low-income tenants paid no rent for several months after HUD's abatement of the HAP payments." *Id*. at 37. Thus, to Normandy, "the government . . . went too far when it abated the HAP contract payments and shifted a public burden of providing hous-

ing to low-income tenants disproportionately to Normandy." *Id.* at 37–38.

"A 'taking' may occur either by physical invasion or by regulation." *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009). "Typically, when considering whether government action constitutes a regulatory taking, we apply factors set forth in *Penn Central* [*Transportation Co. v. New York City*, 438 U.S. 104 (1978)]: (1) '[t]he economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *CCA Assocs. v. United States*, 667 F.3d 1239, 1244 (Fed. Cir. 2011) (quoting *Penn Cent.*, 438 U.S. at 124).

The Claims Court correctly determined that the *Penn Central* factors do not support Normandy's takings claim. With regard to the first *Penn Central* factor, the economic impact of the regulation, Normandy argues that "HUD failed to give it notice of default, the corrective action required, and a reasonable time to cure the default before HUD abated the HAP payments"; Normandy has found "no compensation alternative that was directly available to Normandy once the HAP payments were abated"; and Normandy was unable to sell the apartments because "HUD did not give reasonable, if any, consideration to the proposed sale before its denial." Appellant's Br. 36, 39.

Normandy asserts it had an "investment backed expectation" that it would continue to receive HAP payments, even though it could "expect [that] subsidy payments might be abated." *Id.* at 40. The Claims Court held Normandy "had neither an investment-backed expectation in the right to receive subsidy payments outside the limitations imposed by the HAP contract nor did it have such an expectation in the right to set rents after it voluntarily agreed to limit that right in exchange for the right to prepay its mortgage." *Normandy*, 116

Fed. Cl. at 442. Though Normandy broadly addresses the first and second *Penn Central* factors, it does so without specificity. Additionally, because the Use Agreement was in effect until 2009, Normandy "was, completely independent of the HAP contract or any HUD regulations, obligated to preserve the Normandy project for low income tenants at reduced rents and could not raise rents without HUD's approval." *Id.* at 441.

Normandy fails to at all address the third *Penn Central* factor, the character of the government regulation. As the Claims Court found, "[t]he [O]riginal HAP [C]ontract made it clear that, should Normandy fail to correct deficiencies in performance to the satisfaction of HUD, HUD could stop assistance payments." *Id.* Thus, "[t]o the extent that plaintiff had a property right in receiving payments, *it was one arising out of the HAP contract*. The relationship between plaintiff and the Section 8 housing program is a voluntary one created by contract." *Id.* (emphasis added; footnote omitted). Normandy's right to the HAP payments was governed by the 2004 HAP Contract with OHFA and conditioned upon third-party HUD's inspections. As the Claims Court noted, Normandy may take issue with the process or administrative procedures of HUD, but its actions do not constitute a taking.

Accordingly, Normandy "did not, by contract, have the right to those payments free of potential HUD oversight. It had contracted away that right." *Id.* at 442. The same line of reasoning applies to Normandy's ability to sell the apartment to Summit. That Agreement provides that Normandy "shall not without the written approval of the Secretary [of HUD] . . . convey . . . any part of the Residential Area." J.A. 204. Normandy thus contracted away that right, and HUD's withholding of approval does not constitute a taking.

## IV. The Dissent

The Dissent expresses concern whether "the United States was correctly eliminated from its contracts with Normandy Apartments, thereby eliminating Tucker Act jurisdiction in the Court of Federal Claims." Dissent Op. 2. Specifically, the Dissent argues judicial estoppel prevents the government from first arguing before the district court that the United States was a contractual party and jurisdiction lies with the Claims Court and then later arguing, in the Claims Court, that OHFA is the contractual party, not the United States. *See id.* at 4–8.

In support, the Dissent cites arguments made by the government to the district court and the Tenth Circuit. The Dissent states that before the district court, "[t]he United States responded that Normandy was in the wrong court, and that this was a Tucker Act suit on a contract with the United States. The government stated that 'this case belongs in the Claims Court and [the Western District of Oklahoma] lacks jurisdiction.'" *Id.* at 2 (alterations in original) (quoting Government's Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj. 20, *Normandy Apartments,* 2007 U.S. Dist. LEXIS 81330). The Dissent also says that before the Tenth Circuit, the government stated "these were contracts with the United States and were actionable only in the Court of Federal Claims under the Tucker Act," such that "'the Tucker Act impliedly forbids the relief sought in this case.'" *Id.* (quoting Government's Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj. 40, *Normandy Apartments*, 2007 U.S. Dist. LEXIS 81330).[1]

---

[1]    The Dissent quotes the government's Tenth Circuit brief, which adopts a passage from the government's district court brief. For purposes of clarity, we cite only the government's district court brief.

The language cited by the Dissent was in the government's Response in Opposition to Normandy's Motion for Preliminary Injunction, specifically the section discussing why the district court lacked subject matter jurisdiction. *See* Government's Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj. 20, *Normandy Apartments,* 2007 U.S. Dist. LEXIS 81330. Where a motion to dismiss for lack of subject matter jurisdiction challenges the sufficiency of the pleading's factual allegations, the court assumes those allegations are true. *Cedars-Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583–84 (Fed. Cir. 1993). Any factual statements made by the government within this portion of its brief must be viewed through that lens.

The government noted the evidence submitted by Normandy "indicates that under its current HAP [C]ontract [it] is eligible for payments" that exceed the Tucker Act's $10,000 ceiling for exclusive jurisdiction in the Claims Court, 28 U.S.C. § 1346(a)(2). Government's Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj. 21–22, *Normandy Apartments,* 2007 U.S. Dist. LEXIS 81330. Thus, the government's arguments imply that it considered Tucker Act jurisdiction to be appropriate in the Claims Court in situations where a party is ultimately seeking monetary relief in excess of $10,000. *See id.* That contention based on assumed facts, in Normandy's Complaint and Motion, is simply irrelevant here.

The Dissent's second quotation is found in the same brief. *Id.* at 40. The Dissent says the government stated "these were contracts with the United States and were actionable only in the Court of Federal Claims under the Tucker Act." Dissent Op. 2. The quotation does not support this proposition when viewed in the context of the brief's structure and surrounding arguments. It is found in the government's preliminary injunction argument discussing jurisdiction and the likelihood of success on the merits.

In discussing the likelihood of the merits, the government explicitly incorporated by reference arguments made in its discussion of subject matter jurisdiction. It stated "[t]he Tenth Circuit has held that the Tucker Act impliedly forbids federal courts from ordering declaratory or injunctive relief, at least in the form of specific performance, for contract claims against the federal government, and that the APA thus does not waive sovereign immunity for such claims." Government's Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj. 40, *Normandy Apartments,* 2007 U.S. Dist. LEXIS 81330 (citing *Robbins v. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006)). The government concluded that section by arguing if the District Court lacked jurisdiction, then Normandy did not show a likelihood of success. *Id.*

The Dissent also contends the government, in this appeal, no longer argues the United States is not a contractual party and no longer directly challenges Tucker Act jurisdiction; and that instead the government argues the merits of the termination. Dissent Op. 8–9.

That is certainly true to the extent that the government no longer contested technical jurisdictional issues because Normandy's case was in the proper venue to determine the merits of the case. Thus, the government addressed the merits—i.e., whether the United States was a party to the 2004 HAP Contract. The Claims Court determined HUD was not in privity with Normandy and accordingly, as a matter of fact, the Claims Court lacked jurisdiction to hear this case.

Thus, the Dissent's assertion of inconsistency evaporates under the light of a full review of the record upon which it relies.

CONCLUSION

For the reasons set forth above, the decisions of the Claims Court dismissing the breach of contract claim for

lack of jurisdiction and granting summary judgment on the takings claim are

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

_____

**NORMANDY APARTMENTS, LIMITED,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Appellee*

_____

2014-5135

_____

Appeal from the United States Court of Federal Claims in No. 1:10-cv-00051-EGB, Senior Judge Eric G. Bruggink.

_____

REYNA, *Circuit Judge*, additional views, with whom WALLACH, *Circuit Judge*, joins.

I join the court's opinion. I write separately to explain why our opinion raises troubling concern. HUD is mandated by Congress to implement and administer the Section 8 program. Through its regulations and past practices, HUD has obligated itself to Section 8 property owners. Yet by creating a separate contract between OHFA and Normandy, HUD has insulated itself from liability. The court's opinion describes why Normandy cannot recover from HUD on the basis of HUD's breach of an express or implied contract. Nor can Normandy recover in property law for the reasons the court explains.

Attempts to recover from HUD on other theories would also have likely failed. The court has generally rejected the notion that a local PHA acts as HUD's agent in administering a HAP contract, despite HUD's extensive involvement in contract administration. *See, e.g.*, *New Era Constr. v. United States*, 890 F.2d 1152, 1154–57 (Fed. Cir. 1989). Though Normandy could have claimed third-party beneficiary status under HUD and OHFA's Annual Contributions Contract (i.e., the contract under which a local PHA receives HUD funding), this court has refused to label a property owner a third-party beneficiary to such contracts. *See, e.g.*, *Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1436–37 (Fed. Cir. 1997); *Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994).

Judicial estoppel arguments would similarly fail because while HUD argued in the district court that Normandy's claim belonged in the Court of Federal Claims, the government did not clearly maintain that HUD was a party to the 2004 HAP contract. J.A. 461 (HUD contended generally that "[a]llegations in Plaintiff's Complaint and Motion [for injunctive relief] demonstrate that this case belongs in the [Court of Federal Claims] and that this Court lacks jurisdiction"). Judicial estoppel arguments thus fail at least because HUD's position at the Court of Federal Claims was not "clearly inconsistent" with its earlier position in district court. *See New Hampshire v. Maine*, 532 U.S. 742, 743 (2001).

In addition, Normandy could not recover from OHFA under the 2004 HAP contract because HUD's assistance payments to OHFA under HUD and OHFA's Annual Contributions Contract would likely be a condition precedent to OHFA's performance under the 2004 HAP contract. *See Haddon Hous. Assocs., Ltd. P'ship v. United States*, 711 F.3d 1330, 1338 (Fed. Cir. 2013) ("Generally, a party to a contract may assert the nonoccurrence of a contractual condition precedent as a defense to a claim of breach."). In other words, OHFA's performance under the

2004 HAP contract depends on HUD funding under the Annual Contributions Contract.

To be clear, this is not a typical case in which sovereign immunity bars suit against the government. HUD simultaneously obligated itself to OHFA—and, by extension, Normandy—under the Annual Contributions Contract *and* exercised significant control of Normandy's property under the 2004 HAP contract, all while remaining insulated from liability. Under HUD's scheme, the government conveniently escapes liability in contract under the Tucker Act—a statute that provided "the widest and most unequivocal waiver of federal immunity from suit," *see United States v. Mitchell*, 463 U.S. 206, 215 (1983), a waiver that Justice Holmes once deemed a "great act of justice," *United States v. Emery, Bird, Thayer Realty Co.*, 237 U.S. 28, 32 (1915).

But justice is hard to find in this case. Despite Normandy's alleged $2.75 million loss, Normandy appears to have no recourse against the government or anyone else. The government's position in this litigation risks undermining Section 8 by discouraging property owner participation in the Section 8 program, the purpose of which is to provide low-income families with a decent place to live. *See, e.g.*, 42 U.S.C. § 1437f. By limiting incentives for property owner participation, HUD's scheme may have negative consequences for Section 8 tenants. Be that as it may, problems offered up by this case and others like it are outside this court's authority to remedy and are best left for another branch of government to address.

# United States Court of Appeals for the Federal Circuit

---

**NORMANDY APARTMENTS, LIMITED,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2014-5135

---

Appeal from the United States Court of Federal Claims in No. 1:10-cv-00051-EGB, Senior Judge Eric G. Bruggink.

---

NEWMAN, *Circuit Judge,* dissenting.

The United States, acting through the Department of Housing and Urban Development (HUD), has since 1968 contracted with Normandy Apartments to provide federally subsidized low-income apartments, called "Section 8 housing" as established by the National Housing Act, 42 U.S.C. § 1437f. After inspections by HUD, wherein HUD criticized Normandy's compliance with the requirement that the apartments be maintained in "decent, safe, and sanitary" condition, in 2007 HUD terminated its subsidy payments. Normandy objected to the termination, stating that the perceived non-compliance was based on temporary disruption due to the ongoing apartment project of installing double-pane windows throughout the complex,

and that it had inadequate opportunity to remedy any perceived deficiency in property maintenance.

My concern relates to whether the United States was correctly eliminated from its contracts with Normandy Apartments, thereby eliminating Tucker Act jurisdiction in the Court of Federal Claims. The government successfully argued this position in the Oklahoma district court and in the Tenth Circuit, and successfully argued the contrary position in the Court of Federal Claims. The panel majority now denies Normandy Apartments all access to judicial review.

## DISCUSSION

Normandy Apartments had initially filed suit against the United States Department of Housing and Urban Development in the United States District Court for the Western District of Oklahoma, asking that court to require HUD to continue the rental subsidies at least until the merits of the issue were resolved. The United States responded that Normandy was in the wrong court, and that this was a Tucker Act suit on a contract with the United States. The government stated that "this case belongs in the Claims Court and [the Western District of Oklahoma] lacks jurisdiction." U.S. Dist. Ct. Br. 20. The district court agreed. *Normandy Apartments, Ltd., v. U.S. Dep't of Hous. & Urban Dev.*, No. Civ.-07-1161-R, 2007 WL3232610 (W.D. Okla. Nov. 1, 2007).

Normandy appealed to the Tenth Circuit, and the United States again moved for dismissal, stating that these were contracts with the United States and were actionable only in the Court of Federal Claims under the Tucker Act. U.S. Br. to 10th Cir. ("The Tucker Act impliedly forbids the relief sought in this case"). The Tenth Circuit agreed, ruling that Normandy's contract claims were within the "exclusive jurisdiction" of the Court of Federal Claims. *Normandy Apartments., Ltd. v. U.S.*

*Dep't of Hous. & Urban Dev.*, 554 F.3d 1290, 1295-96 (10th Cir. 2009).

Normandy then filed suit in the Court of Federal Claims. However, in the Court of Federal Claims the United States argued that there was no jurisdiction in the Court of Federal Claims. The government argued that the contracts were not with the United States, but with an Oklahoma state agency that had signed the most recent Renewal Agreement as "Contract Administrator." The Court of Federal Claims agreed, and dismissed the suit.

Thus the United States obtained dismissal of the contract claims by the Oklahoma district court and the Tenth Circuit on the argument that the contracts are with the United States and can be litigated only in the Court of Federal Claims. The United States then obtained dismissal of the contract claims by the Court of Federal Claims on the argument that the contracts are not with the United States, but with the Oklahoma Contract Administrator. Normandy has exhausted the supply of courts in which it can seek resolution of its claim for breach of contract. In its shifting positions, the government avoided judicial determination of the merits for eight years. I respectfully dissent.

### *The HUD contracts*

Normandy Apartments had two contracts with the United States Department of Housing and Urban Development. The Housing Assistance Payments (HAP) Renewal Agreement of 2004 traces its renewals to 1968. The Regulatory Use Agreement of 2000 stated the conditions of Normandy's prepayment of its mortgage, and also contained all of the substantive terms of the Renewal Agreement.

The Renewal Agreement states that "the purpose of the Renewal contract is to renew the expiring contract for

a new term," Contract Section 4c. Section 4 authorizes HUD to assign the contract to a PHA (public housing agency), but provides that "[n]otwithstanding such assignment, HUD shall remain a party to the provisions of the Renewal Contract that specify HUD's role pursuant to the Renewal Contract, including such provisions of Section 9 (HUD requirements), Section 10 (statutory changes during term), and section 11 (PHA default) of the Renewal Contract." Section 4(a)(2).

The Renewal Agreement, but not the Regulatory Use Agreement, was signed by the Oklahoma Housing and Finance Authority as "Contract Administrator," as authorized by § 1437f(b)(1) of the Housing Act. No substantive changes were made to HUD's continuing authority and responsibility. The government does not dispute that the rental subsidies continued to be provided by HUD, and that HUD retained full control and responsibility for all of the contract provisions, including the rights of inspection and termination as here exercised.

In accordance with the contracts, HUD conducted periodic inspections of the Normandy Apartments property. In 2007 HUD terminated the federal subsidy payments, on the ground that Normandy had not properly maintained the apartments, leading to the litigation starting in Oklahoma in October 2007, and ending with the Federal Circuit.

### *Suit in Oklahoma District Court*

Normandy filed suit in the District Court for the Western District of Oklahoma, seeking to enjoin the termination that was ordered by HUD, and to require that the rental subsidies be continued at least during resolution of the issues in dispute. The United States moved for dismissal on jurisdictional grounds, stating that at "issue in the instant case are agreements between Plaintiff and HUD." Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. at 2. As the district court recited, the United States

raised the question "whether this court has jurisdiction to entertain this action or whether jurisdiction lies exclusively in the Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491." *Normandy*, 2007 WL 3232610, at *1.

The government provided the affidavit of Mr. Herman Ransom in his position as Director of the HUD Multifamily Hub responsible for HUD's housing programs in the region that includes Oklahoma. He averred that "Normandy Apartments, Ltd. ('the owner') entered into a Housing Assistance Payments ('HAP') contract with HUD September 2004," and that the contracts provided that HUD would pay Monthly Rental Assistance "according to HUD's regulations and administrative procedures," citing Agmt. §7(a). Ransom Aff. Mr. Ransom also described the Regulatory Use Agreement of 2000, between Normandy Apartments and HUD. He stressed that the Normandy Apartments contracts are with the United States, with elaboration such as "HUD has not authorized OHFA to conduct physical inspections of Normandy Apartments." Ransom Aff. Thus the government argued that these were contracts with the United States, and that remedy for the asserted breach was available only in the Court of Federal Claims. The Oklahoma district court agreed, and ruled that "Plaintiff's claims arise out of a contract with the government and are for breach of that contract and breach of regulations covering and relating to that contract, the latter of which plaintiff could not even assert if it did not have a HAP contract with HUD." *Normandy,* 2007 WL 3232610, at *2.

The district court recited "HUD's decision to abate Housing Assistance Payments and to terminate the HAP contract," and reiterated that "plaintiff's claims are founded upon an express contract with the United States and on regulations of an executive department. *See* 28 U.S.C. § 1491." *Normandy,* 2007 WL 3232610, at *1, *2. The court held that "jurisdiction over this case lies exclu-

sively in the United States Court of Federal Claims pursuant to the Tucker Act." *Id.* at *2.

### *Appeal to the Tenth Circuit*

Normandy Apartments appealed to the Tenth Circuit, and the government again moved for dismissal for lack of jurisdiction. The Circuit court held that although Normandy's APA claims were within the district court's jurisdiction, since the contracts were between the United States and Normandy Apartments, the count "alleging an ordinary breach of contract, seeks equitable relief for a contract claim against the government. Because the Court of Federal Claims has exclusive jurisdiction to hear such a claim, the district court properly declined to take jurisdiction over it." *Normandy,* 554 F.3d at 1299.

The Tenth Circuit observed that "[u]nder HUD regulations and Normandy's contract with HUD, Normandy was required to maintain the units," *id.* at 1294, and reiterated that the Court of Federal Claims is the exclusive venue for suit for breach of a contract of this magnitude with the United States, *id.* at 1299.

### *The Court of Federal Claims*

Normandy Apartments then filed suit in the Court of Federal Claims. However, unlike the position on which it had prevailed in the district court and the Tenth Circuit, the government argued that the contracts are not with the United States, but with the Oklahoma housing authority as "Contract Administrator." The principles of judicial estoppel foreclose such maneuvers:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *see, e.g., Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.").

This is not a new principle, *see Davis v. Wakelee*, 156 U.S. 680 (1895):

> It may be laid down as a general proposition that, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

*Id.* at 689. Nor is this principle new to the Federal Circuit. In *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) this court recognized that "where a party successfully urges a particular position in a legal proceeding it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed."

On this appeal the government does not dispute that HUD retained its full contract rights and obligations, including the right of termination. It was HUD that inspected the property, and it was HUD that terminated the contracts. This relationship is not overridden by the selection of a state housing authority as "contract administrator." By the Housing statute, HUD "is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments," 42 U.S.C. §1437f(b)(1), and "[t]he Secretary shall embody the provisions for such annual contributions in a contract guaranteeing their payment," 42 USC §1437c(a)(1).

However, such authorization does not remove HUD from its contractual obligations to the property owner.

HUD's public housing Guidebook for Section 8 contracts is explicit that HUD is "contractually bound" by the Renewal Contract executed by a state housing authority:

> When a Renewal Contract is executed by a PHA [public housing authority] pursuant to this Guidebook, in accordance with HUD requirements and on the form prescribed by HUD, HUD is contractually bound by the Renewal Contract provisions that specify HUD's role pursuant to the Renewal Contract.

William C. Apgar, HUD Office of Multifamily Housing, *Section 8 Renewal Policy* (2001). The Guidebook is explicit that a renewal executed by a state housing authority does not relieve HUD of its contract obligations. And although the 2004 Renewal Agreement was signed by the Oklahoma authority, the Regulatory Use Agreement, which incorporates all of the contract obligations between HUD and Normandy Apartments, was executed by HUD, with no reference to any state authority.

Despite these explicit statements of HUD's position, obligations, and authority, the Court of Federal Claims held that the "plaintiff is unable to enforce its rights in that contract against the federal government because the United States was not a party to it." Fed. Cl. Op. at 20. The Court of Federal Claims also rejected Normandy's alternative ground that its property had been taken in violation of its Fifth Amendment rights. Normandy now appeals to the Federal Circuit.

### *Appeal to the Federal Circuit*

The government no longer argues that these contracts are not with the United States, and does not directly challenge Tucker Act jurisdiction. The government recites that HUD funded the federal subsidy to Normandy,

that HUD inspected the Normandy Apartment premises, and that HUD terminated the subsidy payments. *See, e.g.*, U.S. Br. 6-7 ("HUD abated—that is, suspended—funding for HAP payments by OFHA to Normandy"). The government does not argue in this court that the Oklahoma "Contract Administrator" removed the United States from the contracts with Normandy.

Instead, the United States now seeks to argue the merits of the termination, stating that HUD did not breach the contracts because Normandy had not maintained the apartments in "decent, safe, and sanitary condition." U.S. Br. 7. The propriety of the termination is the issue for which Normandy has been seeking a forum, now for eight years. The merits of the contract claim have never been decided. And the Federal Circuit is not a trial forum, for ab initio resolution of Normandy's claim.

### *Summary*

The United States argued successfully in the Oklahoma district court and the Tenth Circuit that this case belongs in the Court of Federal Claims because the contracts are with the United States. The United States then argued successfully in the Court of Federal Claims that the contracts are not with the United States. This is not only a classic exemplar of judicial estoppel, but the jurisdictional ruling of the Court of Federal Claims is incorrect, for the contracts are indeed with the United States, and subject to the Tucker Act.

I do not know how the merits would have been decided, had they been litigated. With the court's ruling today, however, all paths to judicial resolution appear to be closed. This is not the process envisioned by President Lincoln, his words carved at the entrance to this courthouse: "It is as much the duty of government to render prompt justice against itself in favor of citizens as it is to administer the same between private individuals."

I respectfully dissent.